Filed 9/27/16  Zeigler v. Oss CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LINDA LEIGH ZEIGLER, Plaintiff and Appellant, v. SHIRLEY MARIE OSS, Defendant and Respondent. | G052230 (Super. Ct. No. 30-2014-00753345) O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Kim R. Hubbard, Judge.  Affirmed.

Linda Zeigler, in pro per., for Plaintiff and Appellant.

John L. Dodd & Associates, John L. Dodd and Benjamin Ekenes for Defendant and Respondent.

*          *          *

Linda Zeigler appeals the trial court's order denying her petition for an elder abuse restraining order to protect her 95-year-old mother, Lorraine Zeigler, from Linda's sister, Shirley Marie Oss, who along with her brother Benjamin John Zeigler, serve as trustees of a family trust after their father, Samuel Zeigler, died and Lorraine became incompetent.[1]  Two other siblings, Lori and Bob, supported Shirley and Benjamin in their administration of the trust and in the decisions for their mother's care and support, but Linda became concerned after finding a handwritten inventory of "Mom's assets" that suggested there should be more cash in a safe deposit box or boxes in Lorraine's name. A guardian ad litem appointed by the court on Lorraine's behalf determined from Samuel's records that the handwritten inventory could not be correct because, based on the elder Zeigler's "careful accounting," he would not have failed to mention "$500,000+ in cash" and, moreover, it was "unlikely . . . he would not have invested it if it existed."

The trial court held a hearing at which it denied Linda's petition, while also observing that Lorraine "does not want a restraining order against Shirley."  On appeal, Linda's contentions are difficult to decipher, but appear to be aimed at her displacement in 2007 as a potential successor trustee of the family trust.  She does not provide record citations demonstrating she raised these contentions below or that they were relevant to the issue before the trial court.  Because Linda fails to establish error necessary for reversal, we affirm the trial court's order.

I

FACTUAL AND PROCEDURAL BACKGROUND

Linda sought the restraining order ex parte in October 2014.  Identifying herself as a family trust beneficiary and "Past Co-Trustee," Linda named Shirley, but not Shirley's cotrustee Ben, as the "Person From Whom Protection Is Sought."

---

[1]  Because many of the individuals in this case share the same last name, we use their first names for ease of reference and intend no disrespect.  (See, e.g., *In re Marriage of Olsen* (1994) 24 Cal.App.4th 1702, 1704, fn. 1.)

2

Linda's petition alleged in a jumbled fashion: "Demensia [*sic*], Alztimers [*sic*], $600,000 missing — Resident 40 y[ea]rs Huntington B[ea]ch.," adding also, "Money missing Not denied taking it Do deny telling me where it is — Claiming 4 [siblings] against 1. All beneficiaries can act alone or jointly can be disinherited w/ these acts." (Capitalization in material quoted from the petition is adjusted for readability.) The petition alleged Shirley abused her mother "Financially & Mentally," that the abuse "Could be daily — Financially, Internet transfers (P[ower] O[f] A[ttorney] Abuse)," and that the abuse was *not* "only financial abuse," but included, cryptically, "Endangerment scooter @ age 92 up Beach Blvd."

The petition alleged as the basis for suspected financial abuse: "In effort to clean — Found letter stating $591,000 = in safety deposit box, moved there by [Shirley] 11/10/11 — closed 8/2012 per BOA — now that I know[,] filed police report . . . last night." The petition explained in a somewhat garbled manner: "Money belongs to trust — For Mom's care and distribution after expenses paid — split 5 equal ways. Trust titled fund converted personal — cashed [or?] transferred." Linda alleged Shirley inflicted "mental suffering," but failed to describe on the form petition "what the person was deprived of and how that affected him or her."

Linda sought court orders directing Shirley not to abuse Lorraine, "to not withdraw money from Accts[,] transfer or do any financial transactions other than pay her bills," and to stay away from Linda's home and "work (when found)," nor "visit Mother in HB at same time — until financials ID'ed & safety assured." Linda also wanted Shirley to surrender her passport or "VISA," noted Shirley was arriving from out of state with possible trepidation that "she[']s coming to get me," and concluded, "I also ask the court to restrict [her other siblings] not to contact [her]," requiring "all parties shall remain independent."

The trial court denied Linda's request for a temporary restraining order, appointed John H. Lejnieks as Lorraine's guardian ad litem (GAL) from a panel of

3

approved attorneys, and set the matter for a further hearing. In the meantime, Shirley filed a response to Linda's petition, denied Linda's claims of abuse, and explained she believed Linda was "angry because my mother chose to put my brother Ben and I in charge of my mother's financial and medical affairs." As background, she noted that when her father Samuel died in March 2000, Lorraine continued to live on her own in the couple's home in Huntington Beach for more than a decade, but in June 2007 Lorraine vested Shirley and Ben with "Durable Power of Attorney . . . to serve as co-agents for [their] mother." Since 2011, Lorraine had lived in a "Senior Living" facility in Huntington Beach and in September 2014, the month before Linda's petition, Lorraine's doctor had "certified that [Lorraine] is unable to make legal, financial or medical care decisions for herself due to dementia." Shirley attested that "[a]t all times, I have honored my mother's request to act on her behalf in handling her financial affairs. I have never at anytime misappropriated funds or acted in my own best interests in handling my mother's affairs."

Shirley and Linda's sister Lori also submitted a letter opposing Linda's petition, explaining that she "fully trust[s] Ben Zeigler and Shirley Oss to conduct the affairs of our mother." She noted, in particular: "Mother is in a very safe and secure environment at [the senior living facility]. She is very happy there and has a beautiful room overlooking a rose garden and pool area. Her meals are taken in a formal dining room, with linen table cloth[]s. The center has periodic field trips and special events on location. Mother also enjoys the weekly church services conducted at the center . . . . I cannot tell you how grateful I am [for] the excellent care my mother is receiving at [the center]."

Lori recalled in her letter that "[y]ears ago mother expressed a desire for her finances to be kept private and known only between Ben and Shirley." She observed, "I suppose if this [upcoming] court session requires an audit of mother's books, then so be

4

it. However, I don't see where Linda is entitled to perform this audit. An outside agency should do this, appointed by the court system."

Linda, Shirley, and Lorraine testified at the next court hearing in November 2014. Linda does not provide on appeal a reporter's transcript of the hearing, but it appears she introduced a two-page handwritten summary of assets from September 2012, entitled "Mom's Assets," which Lorraine had signed at that time. The asset list included substantial investment accounts and bank accounts totaling over $400,000, and a second page stated the cash "contents of Mom's safety deposit" box or account. Those cash holdings were listed in six notations of "$20,000," four notations of "$100,000," two notations of "$25,000," and a certificate of deposit for $1,200 that had been "cashed out [and] given to Benny." The asset summary specified, "As of today, no beneficiary owes me any money."

The court granted the newly-appointed GAL's request for a continuance to review the file, and the court also authorized the GAL to review with a third party present the contents of Lorraine's two safe deposit boxes at Bank of America.

The GAL found that Lorraine had held one of the safe deposit boxes for only a week in October 2008 and then she immediately closed it. Nothing revealed whether the box actually had contained anything, and bank records showed only Lorraine and no one else possibly accessing it. In any event, the 2008 closing date of the box preceded the date in 2011 when, according to another handwritten note Linda furnished, the cash contents of Lorraine's safe at her home were transferred to a safe deposit box.

The GAL examined the contents of the remaining safe deposit box with a third party present, and bank personnel inventoried the box. The GAL in an initial report concerning the box contents noted potential labeling inconsistencies, including that some envelopes containing cash were labeled both "$25,000" *and* "25 x 100" (note: 25 times 100 totals 2,500 — not 25,000). Consistent with the "25 x 100" notation, these envelopes contained $2,500 rather than the higher, contradictory $25,000 figure stated on the

5

envelope and on the handwritten inventory Linda had found. Similarly, the four envelopes Linda expected to contain $100,000 each were likewise understated by a factor of 10, containing one hundred $100 bills totaling $10,000 each, instead of $100,000. The GAL noted that while Linda's handwritten "informal inventories" suggested the box should contain $570,000 (accounting for the $1,200 CD distributed to "Benny"), the "actual cash in the box total[ed] $147,100." The GAL observed the cash amounts in the box consisted entirely of $100 bills and the box already "was completely filled." In other words, "there would not have been room for an additional 4,730 one hundred dollar bills . . ." that Linda expected. The potential labeling inconsistencies the GAL noted would account for the "missing" cash, in which case it would not be missing at all.

The GAL met with Lorraine at her "very nice assisted living facility," but she "had no recollection as to what the actual amounts were or who wrote them" on the envelopes. Shirley explained that "neither her father, prior to his death, nor her mother, subsequently, would have accumulated that much cash over and above their other assets," which suggested "a math and labeling mistake."

In a second report months later, the GAL explained that he obtained from the family "two large boxes containing substantial amounts of financial records, including a critical 20 year period from 1980 to 2000," which closed with Samuel's death in March 2000. The GAL reported: "I examined all of the pertinent records in considerable detail. Mr. Zeigler kept extraordinarily careful records of all of their finances and he was an active investor. [For 2000,] Mr. Zeigler showed a total value of their combined estate was $594,954.00. Of that amount, only $43,879.00 was in cash in checking and CD accounts. There is a reference [in the records] to a safe deposit box . . . at Washington Mutual. However, an inventory of the box dated October 1, 1999, . . . lists its contents. No cash is described. Given Mr. Zeigler's careful accounting, it seems unlikely he would have made no mention of $500,000+ in cash and that he would not have invested it if it existed."

6

The GAL summarized: "My conclusion is there is no possibility that the total inventory amounts of cash shown on [Linda's handwritten] Exhibits 2 and 3 ever existed and that the amount of cash in the box at the time of my [in-person] inventory . . . is the correct amount. I met again with Mrs. Zeigler on April 30 following my review. Unfortunately, her memory has become even more impacted since my first interview with her. She was unable to provide any independent information concerning these matters. She was able to state that her needs are being met and she has no complaints concerning the handling of her financial affairs by Shirley Oss and Benjamin Zeigler."

At a hearing in May 2015, the trial court denied Linda's petition on grounds of both financial and elder abuse, stating in its minute order, "Restraining order as requested is denied without prejudice in its entirety." The court observed that Lorraine "does not want a Restraining Order against Shirley Marie Oss." The hearing was reported, but Linda omits on appeal a transcript of the hearing . The court retained jurisdiction to allow Lejniek to file a petition for his fees, and set a hearing for Shirley's attorney fee request. Linda asserts the trial court erred in denying her petition, and now appeals.

II

DISCUSSION

On appeal, we must presume the trial court's ruling is correct, unless and until the appellant demonstrates error. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.) The appellant bears the burden to show error in the trial record. (See *Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 58 [fundamental principles of appellate review include: "(1) a judgment is presumed correct; (2) all intendments and presumptions are indulged in favor of correctness; and (3) the appellant bears the burden of providing an adequate record affirmatively proving error"].) These same precepts apply equally to parties appearing in propria persona. (*First American Title Co. v. Mirzaian* (2003) 108 Cal.App.4th 956, 958, fn. 1; *Bianco v. California Highway Patrol*

7

(1994) 24 Cal.App.4th 1113, 1125-1126.)  Similarly, represented and self-represented appellants each must present their claims of error with specific arguments under specific headings marshalling specific facts.  (Cal. Rules of Court, rule 8.204(a)(1)(B) & (C); see, e.g., *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.)  Accordingly, we review in turn each of Linda's arguments for reversal, as best we can discern them from each heading and accompanying argument in her brief.

Linda asserts in her first heading:  "AB Trusts-Created [U]pon the Death of Trustor to Die 3/24/2000-Combined."  (Capitalization modified for readability in this heading and those that follow.) We are unable to make sense of the heading or the paragraphs that follow, nor their relevance to the appeal, but, in any event, there is no direct or indirect assertion in these paragraphs that the trial court erred, which is the purpose of our review on appeal.  "An appellant 'must convince the court, by stating the law and calling relevant portions of the record to the court's attention, that the trial court decision contained reversible error.'  [Citations.]"  (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co*. (1995) 37 Cal.App.4th 855, 869.)

As other courts have observed, when an appellant divorces the argument portion of his or her brief from its factual underpinnings and supporting record citations, it is extremely difficult for an appellate court to piece together the basis for the party's claim or even what he or she intends to say.  (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239 & fn. 16.)  The reviewing court cannot be expected to make cross-references or connections that a party simply assumes are apparent.  "Issues do not have a life of their own," (*Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99) but instead must be spelled out clearly.  A court has no obligation to construct a cogent narrative or provide analysis to decipher a party's claims.  (*Ibid.*)  This section of Linda's brief asserts no basis for reversal, and we find none.

The next heading in Linda's brief addresses agency, and this section is similarly opaque, with no apparent argument that the trial court erred.  The heading states

8

simply, "Agent (Created by Changes Dated 6-1-2007 (Non Attorney Preformed [*sic*]."
The paragraphs that follow include a litany of citations concerning agency law and many
"CPC" code citations, but no claim that the trial court erred.  A subheading states,
"Substitution Changes Not Addressed Preformed [*sic*] by Non-Attorney Money Moved,"
but it is no more decipherable or helpful than the rest of the section for two reasons.

First, it is not followed by any argument, and therefore is forfeited.  (See
*T.P. v. T.W.* (2011) 191 Cal.App.4th 1428, 1440, fn. 12 [incomplete, undeveloped
arguments are forfeited].)  Second, any remote suggestion of an argument is forfeited by
failure to provide record citations showing the party brought the argument to the trial
court's attention and obtained a ruling.  (See *People v. Partida* (2005) 37 Cal.4th 428,
435 (*Partida*) ["A party cannot argue the court erred in failing to conduct an analysis it
was not asked to conduct"]; see also *Duarte v. Chino Community Hospital* (1999)
72 Cal.App.4th 849, 856 (*Duarte*) ["'It is the duty of a party to support the arguments in
its briefs by appropriate reference to the record, which includes providing exact page
citations'"].)

Linda's next heading states, "Confidential Relationship (Medical
Incapacitation/Medical Declining)."  Three paragraphs follow, and the first two make no
claim of error.  The third paragraph is one run-on sentence and appears to be a partial
subheading stating, "Court Errored [*sic*] Not Addressing Health Decline and Legal
Changes Not Properly Addressed," followed by an assertion that "Demensia [*sic*] on
record for three years since 2011 while money not being administered properly without
any proof (CPC § 6.35B)."  Again, any argument in this material is forfeited for lack of
record citations showing it was preserved below.  (*Partida*, *supra*, 37 Cal.4th atp. 435;
*Duarte*, *supra*, 72 Cal.App.4th at p. 856.)  For example, Linda provides no factual
support in this section for her claim of "money not being administered properly."  Our
review is limited to determining whether any error "appears on the record."  (*Bond v.
Pulsar Video Productions* (1996) 50 Cal.App.4th 918, 924.)  Appellant declined to

9

include a transcript of the hearings and points to nothing in the clerks' transcript to support her bare assertion of improper administration.

Another heading recites, "Undue Influence," with parenthetical citations to the "California Elder Dependant [*sic*] Adult Civil Protection Act" and the "Welfare Code." But the two paragraphs under this heading make no argument that the trial court erred, and therefore do not provide any basis for reversal.

Appellant devotes a section of her brief to "Errors (As a Result of Guardian Ad Litem[']s Biased Singular Views." In this section, she argues: "The Court also erred and abused its discretion by prejudicially excluding relevant evidence from the Appella[nt], not considering Lorraine's state of mind, relevant evidence that Lorraine did not have independent advice in making the transfer of the property or liquidation of assets." But appellant does not support her claim with record citations. She does not include a record transcript or provide citations to anything in the clerk's transcript suggesting the trial court made rulings excluding her evidence. She does not provide record citations showing she made an offer of proof of evidence she now claims the trial court excluded. "[A]n offer of proof must be specific. It must set forth the actual evidence to be produced and not merely the facts or issues to be addressed and argued." (*People v. Schmies* (1996) 44 Cal.App.4th 38, 53.) Her bid for reversal on the basis of excluded evidence therefore fails. (Evid. Code, § 354, subd. (a) [an appellant cannot establish grounds for reversal unless "[t]he substance, purpose, and relevance of the excluded evidence was made known to the court"].)

Linda claims in this same section that the trial court disregarded her 53-year relationship with her mother, but the mere fact of that filial relationship did not entitle her to a restraining order against her sister, who also had a mother-daughter relationship. Linda claims the GAL was biased against her, but provides no citations to the record to show she raised this claim for the trial court to adjudicate. We note in our review of the record that Linda submitted a declaration *after* the trial court's ruling asserting the GAL

10

was biased, but she did not file a motion for reconsideration (Code Civ. Proc., § 1008) or *any* motion to bring her claim before the court. The trial court cannot be faulted for failing to consider postdecision matters on which no party sought a ruling. (*Partida*, *supra*, 37 Cal.4th at p. 435.)

Appellant's final heading in her opening brief is simply, "Shift the Burden." She argues in this section that the trial court "was in error to hold the Petitioner to the burden of proof showing wrongdoing rather than shift the burden of proof to the defendants requiring them to prove good faith and fairness in the scope of providing protection to Lorraine. To prove their claimed questionable theory of Mislabeling of Envelopes was illogical when other evidence unable to be presented contradicts repondent's theory." But again, appellant provides no support for her claim of "evidence unable to be presented." Additionally, appellant recognizes that "the burden shifts" only "[o]nce the presumption [of undue influence] has arisen . . . ." But she points to no evidence of undue influence, nor provides record citations that she attempted to prove undue influence and the trial court excluded her evidence or that her evidence was so overwhelming the trial court was required to accept it despite the usual burden of proof on the petitioner. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)

To the extent appellant may have made new arguments in her reply brief, we may not address new arguments not raised in the opening brief. (*Sourcecorp, Inc. v. Shill* (2012) 206 Cal.App.4th 1054, 1061-1062, fn. 7.) This rule applies with equal force to appellants appearing in propria persona. (*Wantuch v. Davis* (1995) 32 Cal.App.4th 786, 795.)

III

DISPOSITION

The trial court's order denying Linda's petition for a restraining order is affirmed. Respondent is entitled to her costs on appeal. Respondent may file a motion in the trial court for that court to determine if she is entitled to her attorney fees for

11

prevailing on appeal, under Welfare and Institutions Code, section 15657.03, subdivision (t).


                                        ARONSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


THOMPSON, J.