Filed 10/20/22  N.S. v. B.S. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| N.S.,<br><br>    Respondent,<br><br>v.<br><br>B.S.,<br><br>    Appellant. | E075971<br><br>(Super.Ct.Nos. FLHE1907205 &<br>DVHE1906145)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Mark Mandio, Judge.

Affirmed.

B.S., in pro. per., for Appellant.

No appearance for Respondent.

Appellant B.S. (Husband) appeals the grant of a domestic violence restraining order (DVRO) issued pursuant to the Domestic Violence Prevention Act (DVPA) ordering him to keep away from respondent N.S. (Wife), and their four children, for a period of three years, expiring on July 23, 2023.

1

On appeal, Husband essentially contends the trial court abused its discretion by granting the DVRO. Wife has not filed a response. The trial court did not abuse its discretion by granting the DVRO.

## FACTUAL AND PROCEDURAL HISTORY

### A.    REQUEST FOR DVRO

On October 7, 2019, Wife requested a DVRO against Husband. She sought an order for Husband to stay away from her, their residence located in San Jacinto, her pets, and their four children.[1]

Wife provided a declaration as to the abuse which had been perpetrated by Husband. She described Husband as being very controlling. If she did not answer the telephone promptly, he would send someone to check on her. He would then yell at her for 30 minutes. He threatened her that he was going to destroy her. He also threatened he was going to have her put in jail because she was a criminal and that his mistress would get custody of their children. He threatened their children. He threatened to use a gun or a knife on her. Wife also stated Husband kicked her out of their house in 2014 or 2015. He told her, "I'm telling you once, if you ever going to touch another man, I will destroy your face so nobody else will ever look at you." Wife also sought an order that Husband not be able to travel with their children as she feared he would not return the children. He frequently traveled to Switzerland to visit family and to conduct business.

---

[1] Wife and Husband shared two daughters, ages 14 (So.S.) and 12 (Sa.S.); and two sons, ages 11 and eight.

2

On November 21, 2019, Wife filed for divorce against Husband in California. Wife and Husband were married on October 21, 2003, and separated on June 10, 2019. She declared that Husband had moved to Switzerland. Wife listed all of their marital assets.

Wife sought emergency orders for child and spousal support, and for attorney's fees and costs. She also sought to collect all rental income from their businesses. Wife claimed she did not have a higher education, little work experience, and was only qualified for minimum wage jobs. She had been a stay-at-home mother for several years. She handled some business affairs for Husband when he was out of the country in Switzerland. Husband earned $300,000 a year. They had a very high standard of living. Husband had frozen or closed community accounts and cancelled Wife's credit cards. Wife provided a declaration attesting to their income; that Husband had been freezing accounts; and the amounts she was requesting for child and spousal support; and attorney's fees and costs.

The appellant's appendix does not include any response filed by Husband to the request for DVRO.

## B.    DVRO HEARING

The matter was heard on May 21, 2020. Husband appeared by telephone as he was living and working in Switzerland.

Wife testified on her own behalf. In June 2019, whenever she and Husband were alone together, he would force her to have sex with him. He would tell her she would never see the children again and would be living on the streets if she did not comply. In

3

August 2019, he came back from Switzerland to the home where she was staying with the children. While he was in the house, he continued to threaten her that she had to listen to him, or he would not pay her rent. He told her she had no rights. He was very aggressive with her during sex and she did not like it. She could not do anything because he would threaten to take the children away from her.

Wife also indicated that in October 2019, while Husband was in Switzerland, he sent his daughter from a previous relationship, Claudine, to threaten her that Claudine was seeking a power of attorney to take their children away from her. Husband was on a speaker phone and told Wife that she was a criminal, a liar, and that she was going to end up in jail. The children would be taken from her and she would never see them again. He also threatened to destroy her.

Wife explained that he threatened her that she would go to jail because he accused her of stealing from him. Husband accused Wife of stealing $390,000 from him. Wife insisted that they had sold a restaurant that they co-owned and the money was her share of the proceeds that he had never given to her. She had attempted to withdraw the money from one of their bank accounts in September 2019. She was unable to withdraw the money because a hold was put on the check. She had never been arrested.

Wife called the police on October 5, 2019, because Claudine was at the house. Claudine told Wife she needed to shut up because she was in charge. She told the children not to listen to Wife because she was a criminal. Law enforcement responded. Claudine tried to argue that she had power of attorney to take the children but they told

her she could not take the children from Wife who was the mother. Claudine placed her phone in the faces of the children so that Husband could tell them what to do.

Several incident reports from October 5, 2019, are included in the record on appeal and it appears the trial court reviewed them. Claudine reported to the police that Wife, her stepmother, had attempted to commit fraud. Wife had taken checks out of a safe in the house. Claudine reported Wife was not authorized to use the account. Wife wrote a check for $390,000 on Husband's account and deposited it into her own account at the bank. Wife advised the responding officer that she believed the account upon which she drew the check belonged to both her and Husband. The check had been pre-signed by Husband and was not forged. She believed she was entitled to half of the money and needed it to pay her divorce attorney. No criminal charges were recommended. It was also reported that one of the children stated she was afraid of Husband and that Husband had slapped her several times.

Wife also stated that just after they were married, in 2004, Husband had hit his son from another marriage, causing his face to bleed. This scared Wife. She had heard Husband threaten Claudine on several occasions. Husband had told Claudine she would not be successful in life and she had previously run away from home.

During their marriage, Husband had screamed at their children calling them "losers" and that they were " 'not going anywhere with this behavior.' " He threatened to shave the children's heads. Husband had also threatened to shoot their animals; they had two horses, seven dogs and three cats. He had thrown the cats at a wall. He would make these threats in front of the children.

5

During a phone call with So.S., in August or September 2019, Husband had threatened to pull her out of her school and put her in a more difficult school. He always wanted to talk to So.S. alone without Wife listening. He would use a very loud voice when speaking to her and their children.

Wife and Husband had not lived together since 2014. The threats to cut off her face detailed in the request for DVRO occurred in 2014 and 2015. She did not file a restraining order at that time. She had called the police for the first time in October 2019 while Husband was in Switzerland. She decided to file a restraining order to protect their children.

Wife had filed for divorce in California on November 1, 2019. The children had primarily lived with Husband from 2014 through 2019. She claimed that Husband forced them to live with him and he kicked her out of the house. Wife acknowledged that Husband paid her rent while she was living outside the family home. He threatened to not pay her rent unless she did things for him, such as have sex with him. He also required her to take off her clothes during video phone calls. She complied because she was afraid of him and that he would take away their children.

Wife also presented the testimony of their daughter, So.S.[2] She was almost 15 years old. She was home in October 2019 when Claudine came to their home. So.S.'s

_____

[2] Husband initially objected on due process grounds because the allegations regarding abusing So.S. were not set forth in the request for DVRO. However, that objection was withdrawn by counsel.

three siblings were also present. Husband had called one of her siblings earlier in the day stating he was sending Claudine to the house to take all of the children away from Wife.

In August 2019, So.S. and Husband were together in a car. Husband slapped her across the face because she had erased a phone number. He called her dumb. He made her exit the car and wait in the parking lot for 20 minutes.

In July 2019, while they were at a family wedding, Husband told So.S. to clean up a mess that she insisted was made by her siblings. She told him to have her siblings clean up the mess and he slapped her in the head. He told her not to talk back to him. So.S. had overheard Husband tell his friends about Wife and his mistress. He would say, " 'I have my bitches under control.' "

In January 2019, Husband had So.S. stack wood at the house. He gave her a specific time to finish but it started raining so she could not finish. He got mad at her for letting the wood get wet. He threw wood at her. He told her she was going to go nowhere in her life like her mother. Another time in December 2018 he got mad at her and punched her in the head. She still had a headache several days later.

So.S. also recalled that when she was in seventh grade, she was late to breakfast. Husband wanted all the children to eat breakfast at a specific time. He punched her in the face causing a bloody lip. She was not allowed to go to school for one week. Husband told So.S. to tell Wife that she had been injured by walking into a door.

So.S. had seen Husband abuse her sibling Sa.S. When Sa.S. failed to properly clean the kitchen, he threw a jar of coins at her and slapped her in the head. So.S. had also witnessed Husband abuse Claudine. Husband discovered that Claudine had a mess

7

in her car.  He beat her causing her nose to bleed covering her entire face with blood.  On another occasion in 2017, Claudine had not cleaned her room.  Husband pushed her against a wall and choked her.  He yelled at her that she needed to get her life together.

So.S. owned a horse and Husband threatened to hit the horse.  He threatened to shoot her dog if she did not get good grades.  So.S. had heard Husband threaten Wife that he was going to slice her face with a knife so no one else would look at her.  She had heard him threaten Wife that if Wife did not have sex with him, he would stop paying for everything for her.

After Wife presented her case, Husband sought a directed verdict.  Husband argued that all of the incidents occurred between 2014 and 2019 and Wife never called the police.  Husband had been out of the country since August 2019 and the restraining order was filed in October 2019.  Husband's counsel argued that Wife had coached So.S. as to what to say during her testimony.  Wife argued that Husband was all about control. Husband threatened Wife every time he came to the house.  He forced her to have sex with him.  The trial court denied the request for a directed verdict.

Claudine testified for Husband.  Claudine went to her family's residence on October 5, 2019, to serve Wife with divorce papers and a power of attorney.  She called Husband when she arrived at the residence.  He was on speakerphone.  She insisted he never threatened Wife or the children.  Wife called the police.  Claudine confronted Wife about taking money and Wife responded she could do whatever she wanted.  Claudine admitted calling Wife a criminal.

8

Claudine lived in the family home with the other children between 2009 and 2017. She denied that Husband had ever hit her. She had never witnessed Husband threaten or hit Wife or So.S. She had never heard him call his and Wife's children stupid or worthless. Claudine believed that So.S. was lying in her testimony because So.S. wanted to stay living with Wife because Wife was not as strict as Husband. Claudine denied that Husband advised her how to testify in court.

Husband called two of his friends who stayed with him and his family at different times between 2013 and 2018. They both witnessed Husband interact with his children and Wife during this time. They had never seen Husband threaten or physically abuse his children, Wife or any of their animals.

Husband also called Natalija. Natalija was married to Husband's oldest son. She met Wife in 2017. She stayed in Husband's home with his children in January 2017. Wife visited the home while she was there. Wife and Husband appeared to have a normal relationship and Wife did not appear to be afraid of him. In November 2019, Natalija had a video call primarily with Wife and So.S. to see if she could get Wife and Husband to work things out amicably. Wife expressed that she and the children no longer wanted to see Husband. Wife told Natalija that the children were afraid of Husband but made no specific allegations of abuse against Husband. Wife told Natalija she wanted a divorce and wanted half of Husband's money. Natalija had never seen Husband physically abuse the children. The children were always happy around Husband.

9

Husband's oldest son Matthias also testified. Wife was his stepmother. Matthias visited Husband in California several times between 2014 and 2018. Wife did not live with Husband but would visit the children who lived in the home. He never observed Husband be mean to the children or hit them. The children were very affectionate with Husband. Matthias had never seen Husband hurt any animals. Wife did not appear scared when she came to Husband's home. Matthias had a long talk with So.S. in July 2019, and she never disclosed that Husband had hit her. Matthias had never been hit by Husband and had never seen Husband hit any of Matthias's siblings.

Another one of Husband's sons also testified. Husband had never hit him. He had never witnessed Husband hit any of the children.

Husband testified on his own behalf. He was not in California on October 5, 2019, and never made any threats to Wife on that day. He was on the phone with Claudine to make sure nothing happened to the children. Wife threatened to take everything from Husband and to put Claudine in prison. She also threatened that he would never see their children again. He sent Claudine to the house to make sure she was there to take care of the children in case Wife was arrested for writing the $390,000 check. Claudine also was to serve divorce papers on Wife. Husband kept presigned checks in his safe in California but Wife did not have access to the safe. Wife used one of these checks. He believed the money belonged just to him.

Husband filed for divorce in Switzerland in May 2019. Wife told him she wanted to be divorced. When he saw her in June and August 2019, he never forced her to have sex with him. He insisted she wanted him to have sex with her. Husband paid Wife's

10

rent from 2014 through 2019. In 2014, when he and Wife separated, they executed a contract that provided that their children would live with Husband.

Husband insisted So.S. was lying about him hitting her. She was lying to stay with Wife, who was less strict. Husband had heard Wife call So.S. a dumb and arrogant kid. Husband admitted he would get upset with the children when they did not do their chores or school work, but they were not afraid of him.

Husband claimed So.S. reached out to him in May 2020 and said that he should be nice to Wife. She wanted to talk about the case but he did not want to talk about it. In September 2019, Wife threatened to destroy his life when he refused to give her more money. She threatened to destroy his life and the life of his newborn baby on November 17, 2019.[3] Husband insisted he was not lying; So.S. and Wife were lying.

Wife called So.S. in rebuttal. So.S. never told anyone in July 2019 that Husband had slapped her in the head. On October 5, 2019, all of her siblings were crying because Husband threatened that Wife was going to go to jail. She claimed that Husband threatened Wife that he was going to destroy her; Wife never threatened Husband. So.S. had seen Husband beat one of their dogs; this had occurred in 2018. So.S. insisted Claudine never served Wife with divorce papers; only power of attorney over the children. So.S. claimed she had told Natalija what Husband had done to her but Natalija

---

[3] Husband had a girlfriend with whom he had fathered a child.

still insisted she should contact him because he was her dad. She told Natalija that she was afraid to be around Husband.

Wife also testified in rebuttal. She told Natalija that Husband had abused the children. Wife had never threatened to take all of Husband's money or that he would never see his children again.

C.     RULING ON THE DVRO

At the conclusion of testimony, Wife's counsel argued it was clear Husband was very controlling. He threatened Wife in order to induce her to have sex with him. Husband had abused So.S. on multiple occasions. So.S. had also witnessed Husband abuse Claudine and Sa.S. He had abused their animals. Husband had control over Wife based on the marriage contract she was forced to sign in order to see her children.

Husband's counsel argued that the parties were separated between 2014 and 2019 but they ran a business together and frequently communicated. Wife claimed that during this time the children were being abused, but never called the police. Wife did not file a restraining order until Husband filed for divorce in Switzerland and she tried to take the $390,000. She did not file for divorce until November 21, 2019, which was over one month after she was granted a temporary restraining order. The case was about the credibility of the witnesses, and So.S. and Wife were not credible. So.S. had a motive to lie because she liked living with Wife, who was not as strict as Husband. She failed to tell the police about the most recent abuse on October 5, 2019, when officers were called to the family home. So.S. had been coached by Wife. Further, Wife had essentially accused Husband of rape but could not recall the dates. Husband's counsel further

12

argued that the original request did not include claims of abuse of the children or threats of rape. It was in the children's best interests to remain in contact with Husband.

The trial court asked the parties, "What is the standard for issuing a restraining order after hearing?" The parties responded Family Code sections 6300 and 6320.[4] The trial court asked if abuse was defined, and the parties responded it was defined in section 6320. The trial court stated it did not provide a definition but thought it may be defined in section 6220. Counsel for Husband referred the trial court to section 6203.

Thereafter, the trial court ruled, "I do believe that sufficient evidence has been presented during the course of this hearing for me to believe that it is more likely than not that [Husband] has engaged in acts of abuse. Specifically, assaultive conduct towards So.S., and then harassing conduct towards [Wife]. So I'm going to issue a restraining order for a period of three years."

The restraining order would expire on July 23, 2023. Husband was not to harass or contact Wife or their four children. He was to stay 100 yards away from their persons, home, vehicles, and the children's schools. He was also to move out of their residence in San Jacinto. Wife was given care of all of their animals. Husband filed his notice of appeal on October 13, 2020.

---

[4] All future statutory references are to the Family Code unless otherwise indicated.

## DISCUSSION

Husband appears to argue that the trial court's decision to grant the DVRO was an abuse of discretion based on its lack of knowledge of the proper standard of domestic violence and failing to make specific findings on the evidence supporting the DVRO; So.S. and Wife were not credible; there was a lack of other evidence such as photographs or testimony from other family members to support the issuance of the DVRO; and the granting of the DVRO violated his due process rights. Husband has failed to properly cite to the record in this case and has provided no legal authority, waiving his claims. Nonetheless, our independent review of the record supports the trial court's decision to issue the DVRO.

Former section 6320, subdivision (a) provides: "The court may issue an . . . order enjoining a party from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, credibly impersonating as described in Section 528.5 of the Penal Code, falsely personating as described in Section 529 of the Penal Code, harassing, telephoning, including, but not limited to, making annoying telephone calls as described in Section 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of other named family or household members."[5] Section 6203 defines

---

[5] Section 6320 was amended effective January 1, 2021, to add subdivision (c), that provides, "As used in this subdivision (a), 'disturbing the peace of the other party' refers to conduct that, based on the totality of the circumstances, destroys the mental or

*[footnote continued on next page]*

"abuse" as "(1) To intentionally or recklessly cause or attempt to cause great bodily injury. [¶] (2) Sexual assault. [¶] To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another. [¶] To engage in any behavior that has been or could be enjoined pursuant to section 6320." It further provides in section 6203, subdivision (b) that "Abuse is not limited to the actual infliction of physical injury or assault."

A.    WAIVER

Although Husband's opening brief contains citations, e.g., on page eight of the opening brief he cites to "86 RT 25," these citations have no correspondence to the record in this case. For example, he cites to "86 RT 25" to support that So.S. testified Husband slapped her in the head during a family wedding. However, neither pages 86 nor 25 of the reporter's transcript refer to this incident. Husband also refers to the "CT" but there is no clerk's transcript in this case; there is only an appellant's appendix to which Husband does not cite. This occurs throughout the opening brief. Husband refers to testimony given at the hearing to support his claim the trial court abused its discretion but

---

emotional calm of the other party. This conduct may be committed directly or indirectly, including through the use of a third party, and by any method or through any means including, but not limited to, telephone, online accounts, text messages, internet-connected devices, or other electronic technologies. This conduct includes, but is not limited to, coercive control, which is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty." Also added were examples of coercive control. The provision was further amended effective January 1, 2022, to add subdivision (5). These provisions do not apply in this case as the restraining order was issued in July 2020.

15

provides this court with no citations in order for this court to determine if such testimony was presented and its impact on the trial's courts decision.

In addition, Husband fails to cite to any legal authority to support his claims. The only legal authority cited by Husband is that a trial court should not abuse its discretion in reaching its decision. He provides no other authority to support what appears to be his arguments that the trial court was unaware of the legal standard for domestic violence, had to make specific findings as to the evidence supporting the DVRO at the time of the judgment, and that this court should consider if his federal constitutional due process rights were violated.

In addition, Husband refers to evidence in the opening brief that does not appear to have been presented to the trial court. For example, Husband contends that Wife suffered from "Malicious Mothers Syndrome," but this court has found no reference in the record to this determination. He also refers to the cultural differences in the legal system and family unit in Switzerland, which could have caused misunderstandings in this case, but provides no citations to this evidence and there is nothing in the record to support that Husband presented this evidence. He further stated that he was a licensed farmer and president of an animal association but that evidence does not appear in the record.

On appeal, " 'A judgment or order of the lower court is *presumed correct*.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; see also *Gee v. American Realty & Construction Inc.* (2002) 99 Cal.App.4th 1412, 1416.) "To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error. [Citations.] When a point is asserted

16

without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' [Citations.] Hence, conclusory claims of error will fail." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) "A party's inaccurate or missing record citations 'frustrates this court's ability to evaluate *which facts* a party believes support his position.' " (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277.) "[I]t is not the role of an appellate court to carry appellate counsel's burden." (*S.C.*, at p. 412) "If a party fails to support an argument with the necessary citations to the record, that portion of the brief may be stricken and the argument deemed to have been waived." (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856; see also *In re Marriage of Carlisle* (2021) 60 Cal.App.5th 244, 255.) Conclusory allegations that Husband's due process rights were violated do not properly " 'tender the issue for appellate review.' " (*Philips v. Campbell* (2016) 2 Cal.App.5th 844, 853.)

Husband has failed to meet his burden of supporting his claims in the opening brief. He fails to properly cite to the record to show where such errors occurred and fails to cite to any legal authority that would support his claims. He refers to evidence that was not presented to the trial court, which cannot be considered by this court for the first time on appeal. As such, Husband's claims are waived on appeal.

B. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN GRANTING THE DVRO

Even if this court were to find that Husband properly raised a claim that the trial court abused its discretion by granting the DVRO, our independent review of the

17

evidence in this case supports that the trial court could determine that a DVRO was properly issued in this case.

"Under the DVPA, the trial court may issue an order 'to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved' upon 'reasonable proof of a past act or acts of abuse.' " (*Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 782.) A permanent restraining order of duration of not more than five years may be issued only "after notice and a hearing." (§ 6345, subd. (a).)

"The DVPA defines domestic violence, as relevant here, as abuse perpetrated against a spouse or the child of a party. [Citation.] Abuse includes 'plac[ing] a person in reasonable apprehension of imminent serious bodily injury to that person or to another' or 'engag[ing] in any behavior that has been or could be enjoined pursuant to Section 6320.' [Citation.] Enjoined conduct includes molesting, striking, stalking, threatening, or harassing. [Citation.] The DVPA requires a showing of past abuse by a preponderance of the evidence." (*In re Marriage of Davila and Mejia* (2018) 29 Cal.App.5th 220, 226, fn. omitted.) "Behavior that may be enjoined under section 6320 . . . includes 'disturbing the peace of the other party' [citation], which 'may be properly understood as conduct that destroys [another's] mental or emotional calm.' [Citation.] 'Thus, section 6320 provides that "the requisite abuse need not be actual infliction of physical injury or assault." ' " (*Curcio v. Pels* (2020) 47 Cal.App.5th 1, 11.)

"We review the grant or denial of a request for a DVRO for abuse of discretion." (*In re Marriage of Davila and Mejia*, *supra*, 29 Cal.App.5th at p. 226.) "We will not

18

disturb a trial court's exercise of discretion unless, as a matter of law, given all the relevant circumstances, we can say (1) the trial court exceeded the bounds of reason, or (2) no reasonable judge would have made the same order." (*McCord v. Smith* (2020) 51 Cal.App.5th 358, 364.)

Here, there was substantial evidence of past abuse that supported issuing the DVRO. The trial court found So.S.'s testimony credible and this court cannot second guess that determination. (*McCord v. Smith*, *supra*, 51 Cal.App.5th at p. 364 ["Credibility determinations are the province of the trial court].) So.S. described numerous acts of abuse, both verbal and physical. Starting in December 2018, Husband punched her in the head. In January 2019, he threw wood at her when he got mad that she let the wood get wet. She insisted that he slapped her in the head while at a wedding in July 2019. In August 2019, he slapped her in the face in the car. In addition, he threatened to abuse her animals. She had further witnessed Husband abuse her siblings. The trial court found So.S. credible that she had been abused by Husband, which supported the DVRO, to prevent any possible future harm to So.S. and her siblings.

Further, Wife provided evidence that Husband was disturbing her peace by destroying her "mental or emotional calm." (*Curcio v. Pels*, *supra*, 47 Cal.App.5th at p. 11.) Wife testified that in June and August 2019, Husband continually harassed her to have sex with him, threatening to cut her off financially and cut her off from her children if she did not comply. She also testified that Husband threatened to shoot their animals. She additionally testified that he threatened to cut her face if she was with anyone else, and So.S. overheard the threat. He threatened to destroy her life and called her a

19

criminal. He threatened that she was going to jail in front of all of the children. The trial court reasonably could determine that Husband's threats to Wife disturbed her mental and emotional calm. She lived in fear of being cut-off financially if she did not comply with his demands, and of losing her children. The trial court did not abuse its discretion by granting Wife's request for the DVRO.

## DISPOSITION

The order of the trial court is affirmed in full. Wife has not appeared in this appeal and Husband shall bear his own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

We concur:

FIELDS
J.

MENETREZ
J.

20