[No. E020473. Fourth Dist. Div. Two. June 3, 1999.]

HERIBERTO DUARTE, SR., et al., Plaintiffs and Appellants, v.
CHINO COMMUNITY HOSPITAL et al., Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts B, C and D.

COUNSEL

Friestad & Giles and Deborah Giles for Plaintiffs and Appellants.

McNeil, Susson & Parrett, James R. Parrett and Edward A. Stumpp for Defendant and Respondent Chino Community Hospital.

Dummit, Faber & Briegleb, Christopher J. Faber and Scott R. Diamond for Defendant and Respondent Honzen Ou.

OPINION

**McKINSTER Acting P. J.**—The plaintiffs, the surviving family members of a woman who died from severe head injuries suffered in an automobile accident, sued the woman's attending physician and hospital for damages for an allegedly negligent failure to either comply with the family's request to terminate use of a respirator or to transfer the woman to a health care provider who would comply. The plaintiffs appeal from a defense verdict. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Martha Duarte (Mrs. Duarte) suffered a broken neck in an automotive accident on June 3, 1991. She was taken to the emergency room of Chino Community Hospital. When she was admitted, she was comatose and was placed on a respirator.

After reviewing the results of an EEG and a CAT scan, the neurologist on the case, Dr. Virabantha, told the family on June 4 that Mrs. Duarte could not recover the ability to think and function as a human being. On June 8, Dr. Virabantha opined that Mrs. Duarte was in a persistent vegetative state as the result of damage to her brain stem and the trauma to her spinal cord. Those injuries were irreparable, according to the consulting neurosurgeon. By June 10, Mrs. Duarte's arms and legs were paralyzed. At that time, Dr. Virabantha felt that she had no chance of recovery.

The family—Mrs. Duarte's husband and six adult children—was advised of her prognosis within the first few days of the hospitalization. The Duartes decided that the respirator should be removed, because that is what Mrs. Duarte would have wanted. That decision was based on prior statements Mrs. Duarte had made to family members. At the time of the accident, Mrs. Duarte was employed as a housekeeper in a hospital, cleaning patients'

rooms. She told her family members that she would never want to be like some of the patients she had seen there, who were just lying connected to a machine, and that if she were in that position, they should just "let her go" rather than use a respirator to keep her alive.

On June 12, a member of the Duarte family told Dr. Virabantha that they wanted Mrs. Duarte removed from the respirator. At some time before that date, one of the family members had informed the nurses of that same request.

On June 13, Dr. Honzen Ou, the treating physician, asked one of Mrs. Duarte's sons to consent to a tracheotomy and a gastrostomy to prepare her for transfer to a long-term care facility. The son refused, and said that he wanted the respirator removed. Dr. Ou said that he would not authorize the removal of the respirator unless Mrs. Duarte became brain dead or the Duartes obtained a court order.

The Duartes retained an attorney. Their attorney's negotiations with counsel for the hospital resulted in a proposed written agreement between the Duartes, the hospital, and Dr. Ou by which the family would release the health care providers from any liability and the health care providers would agree to withdraw life-prolonging treatments. The Duartes signed the agreement on June 20, but Dr. Ou refused to sign it. The hospital informed the Duartes of Ou's refusal about June 27 or 28.

Faced with that refusal, the Duartes' attorney began to prepare a petition for a court order. On July 1, the hospital called the attorney and informed her that Mrs. Duarte was dying. On July 3, Dr. Virabantha determined that Mrs. Duarte was brain dead.

The Duartes sued, inter alia, Dr. Ou and the hospital. Their second amended complaint asserts a variety of claims for damages and declaratory relief, but the only claims presented to the jury were ones for damages on theories of professional negligence and negligent and intentional infliction of emotional distress. The trial court refused to give three special jury instructions requested by the Duartes. By a special verdict, the jury found that neither defendant had been negligent and that Dr. Ou had not engaged in the outrageous conduct required to establish liability for damages for intentional infliction of emotional distress. Accordingly, judgment was entered in favor of the defendants.

The Duartes responded with a motion for a partial judgment notwithstanding the verdict. That motion was denied. They appeal both from the adverse judgment and from the postjudgment order.

## CONTENTIONS

The Duartes do not challenge the adverse judgment on their claims for intentional infliction of emotional distress. However, they contend that the trial court prejudicially erred by refusing to give their proposed special jury instructions Nos. 4, 7 and 8, each of which concerned the claims for damages due to negligence. In addition, they contend that the defendants' refusal to comply with the Duartes' request to remove the respirator was negligence as a matter of law, and therefore the trial court erred by denying their motion for a partial judgment notwithstanding the verdict on the negligence claims.

## DISCUSSION

A. *Because Physicians Are Statutorily Immune From Liability for Damages for Refusing to Withdraw Life-sustaining Medical Care, and Because Damages Were the Only Remedy Sought by the Plaintiffs, the Trial Court Properly Refused to Instruct the Jury Concerning a Physician's Duty of Care When Presented With a Request to Withdraw That Medical Care.*

The trial court refused the Duartes' request that the jury be instructed in the terms of their special jury instruction No. 4:

"If a patient has been diagnosed as being in an irreversible coma and/or a persistent vegetative state, it is the duty of a physician presented with a request to withdraw life-sustaining procedures from that patient to determine if the patient has any reasonable possibility of recovery.

"If the patient does not have a reasonable possibility of recovery, it is the duty of the physician to act according to his patient's wishes. If the patient lacks decision-making ability, it is the duty of the physician to act according to the patient's wishes as expressed by the appropriate decision-makers.

"A failure to fulfill such duty is negligence."

Although the parties disagree over whether that proposed instruction is a correct statement of California law, we need not decide that issue. The only relief sought by the Duartes was damages. Therefore, even assuming that the proposed instruction is correct, that legal principle is relevant to this action only if damages are recoverable for injuries suffered as the result of a breach of the duty described by that instruction. As we shall explain, our Legislature has decided that a physician has no civil liability for refusing to withdraw

life-sustaining services. Given that statutory immunity from liability for damages, the trial court did not err by refusing to give that instruction.

Division 4.5 of the Probate Code (§ 4000 et seq.) governs powers of attorney.[1] Part 4 of that division, starting with section 4600, specifically governs durable powers of attorney for health care. In general, it authorizes a principal to appoint an attorney-in-fact to make health care decisions on behalf of the principal. (§ 4650.) "Health care decisions" include the decision to discontinue health care (§ 4612), even if that care is necessary to keep the principal alive (§ 4703, subd. (a)).

Although the attorney-in-fact under a durable power of attorney for health care has the power to instruct a physician or other health care provider to discontinue health care services necessary to sustain the life of the principal, the Legislature has specifically decided that the provider is not answerable in damages for failing to comply with that instruction: "Notwithstanding the health care decision of the attorney-in-fact designated by a durable power of attorney for health care, the health care provider is not subject to criminal prosecution, civil liability, or professional disciplinary action for failing to withdraw health care necessary to keep the principal alive." (§ 4750, subd. (c).[2])

 The Duartes argue that the immunity provided by section 4750 is not available in this circumstance for several reasons. We find none of them persuasive.

1. *The Immunity Is Not Limited to Refusals to Comply With Instructions From an Attorney-in-fact.*

First, the Duartes argue that the scope of the immunity is limited to refusals by a health care provider to comply with instructions given under the specific circumstances mentioned in the statute, i.e., by an attorney-in-fact designated in a durable power of attorney for health care. It does not apply here, they contend, because Mrs. Duarte had not prepared a durable power of attorney for health care, and thus the family's instruction to withdraw the life-sustaining services of the respirator was not given by an attorney-in-fact.

---

[1] Unless specified otherwise, all further section references are to the Probate Code.

[2] Section 4750 was enacted in 1994, three years after the events on which this action is based. (Stats. 1994, ch. 307, § 16.) However, section 4750 is merely a recodification of Civil Code former section 2438, enacted in 1983. (Stats. 1983, ch. 1204, § 10, pp. 4620-4621.) In particular, subdivision (c) of section 4750 is identical to subdivision (c) of former section 2438 of the Civil Code. Accordingly, despite its change of location in the codes, the law in effect at the time of the trial was the same as that when the events occurred.

We decline to place such a restrictive construction on the scope of the statutory immunity. If an attorney-in-fact has been appointed through a durable power of attorney for health care executed in accordance with the statutory requirements, the authority of that agent to instruct a physician in accordance with the principal's wishes is as clear and strong as possible absent judicial ratification. The statutes regulate the appointment process in significant detail, including: the written disclosures which must be made to the principal (§§ 4703-4704 & 4771-4772); the form and content of the power of attorney itself (§§ 4703 & 4771); the manner of its execution and witnessing or acknowledgment (§§ 4700, subd. (b), 4121, & 4703, subd. (b)); and the qualifications of the witnesses and the attorney-in-fact (§§ 4701-4702). The required disclosures remind the principal that, unless the principal expressly directs otherwise, the attorney-in-fact is authorized to decline or discontinue care necessary to keep the principal alive. (§§ 4703 & 4771.) Indeed, by the terms of the document, the principal may expressly direct the attorney-in-fact to decline particular types of life-prolonging care. (*Ibid.*)

In short, a power of attorney provides a very authoritative and reliable means of insuring that a physician is instructed in accordance with the principal's wishes. Nevertheless, the Legislature has decided that a physician may disregard an instruction from an attorney-in-fact to withdraw health care measures necessary to keep the principal alive without incurring any liability for damages. (§ 4750, subd. (c).)

By contrast, here Mrs. Duarte did not execute a durable power of attorney for health care. Hence, there is no documentation of either her wishes regarding life-sustaining medical procedures or regarding the identity of the person or persons whom she trusted to make health care decisions for her in the event of her incapacity. Therefore, the authority of the Duartes to speak on her behalf and the accuracy of their account of her wishes were inherently less reliable than that of an attorney-in-fact appointed through a power of attorney in compliance with the statutory requirements.

It would be anomalous to hold that a physician is immune from liability for damages suffered as the result of his or her failure or refusal to comply with the more authoritative and reliable instruction, but is not immune from liability for the failure to comply with an instruction from a less authoritative and reliable decisionmaker. After reviewing the legislative history of section 4750, we find no evidence that the Legislature intended to create such an

anomaly in this instance.[3] Accordingly, we hold that subdivision (c) of section 4750 immunizes a health care provider who refuses to comply with an instruction to withdraw health care necessary to keep a patient alive, whether the instruction comes from an attorney-in-fact appointed by the patient or from the patient's family members.

### 2. The Immunity Is Not Limited to Refusals to Withdraw Treatment to Which the Patient or a Surrogate Decisionmaker Had Expressly Consented.

The Duartes also argue that the immunity under section 4750, subdivision (c), applies only to a withdrawal of consent previously given to provide life-sustaining services, that the Duartes never consented to the use of a respirator, and that therefore the defendants are not immune from liability for refusing to remove Mrs. Duarte from the respirator. That analysis fails, for two reasons.

First, the Duartes cite no evidence to support their factual assertion that Mrs. Duarte was placed on the respirator without their consent. ■ "It is the duty of a party to support the arguments in its briefs by appropriate reference to the record, which includes providing exact page citations." (*Bernard* v. *Hartford Fire Ins. Co.* (1991) 226 Cal.App.3d 1203, 1205 [277 Cal.Rptr. 401]; accord, Cal. Rules of Court, rule 15(a).) If a party fails to support an argument with the necessary citations to the record, that portion of the brief may be stricken and the argument deemed to have been waived. (*Ojavan Investors, Inc.* v. *California Coastal Com.* (1997) 54 Cal.App.4th 373, 391 [62 Cal.Rptr.2d 803].)

■ Even if we were to overlook that waiver, the Duartes' suggestion that the immunity cannot apply unless they expressly consented to the initial use of the respirator is incorrect. They rely upon commentary from the

[3]In addition to seeking legislative history materials from the State Archives, we suggested to the parties that they submit any such materials which were relevant to our inquiry and request that we take judicial notice of them. They have asked us to take judicial notice of a variety of documents relevant to the legislative history of section 4750. Those requests are granted.

However, the Duartes also asked that we take notice of studies by the California Law Revision Commission in 1996, 1997, and 1998, years after the enactment of section 4750 and its predecessor in the Civil Code. Although "a subsequent expression of the Legislature bearing upon the intent of the prior statute may be properly considered in determining the effect and meaning of the prior statute" (*Tyler* v. *State of California* (1982) 134 Cal.App.3d 973, 977 [185 Cal.Rptr. 49]), there is no subsequent expression by the Legislature as opposed to the California Law Revision Commission. Even if we could consider the commission's studies, they indicate an intent to change existing law, not simply to clarify it. For both reasons, they are not properly considered in determining the intended scope of the immunity in section 4750, subdivision (c), and the request for judicial notice as to them is denied.

Assembly Committee on Judiciary: "Subdivision (c) provides immunity to the health care provider insofar as there might otherwise be liability for failing to comply with a decision of the attorney-in-fact to withdraw consent previously given to provide health care necessary to keep the principal alive. This subdivision does not deal with *providing* health care necessary to keep the principal alive. The situations where such health care can be provided without informed consent (such as an emergency situation) continue to be governed by the law otherwise applicable."[4]

That portion of the comment on which the Duartes rely—"to withdraw consent previously given to provide health care necessary to keep the principal alive"—does not support their contention that the immunity applies only to the withdrawal of treatment to which someone had expressly consented. That phrase merely reflects the fact that a particular form of health care cannot be withdrawn unless that care is currently being given, and the rule that a patient or some surrogate decisionmaker must usually consent to a particular treatment before it is given. However, as the last sentence of the comment also recognizes, express consent is not always required. In an emergency situation when it is impossible or impractical to get express consent, consent will be presumed (*Thor* v. *Superior Court* (1993) 5 Cal.4th 725, 746, fn. 15 [21 Cal.Rptr.2d 357, 855 P.2d 375]) or implied (*Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 243 [104 Cal.Rptr. 505, 502 P.2d 1]; *Rains* v. *Belshé* (1995) 32 Cal.App.4th 157, 166 [38 Cal.Rptr.2d 185]). That is apparently the case here, because Mrs. Duarte was placed on the respirator immediately upon being admitted to the hospital's emergency room.

The Duartes also urge us to narrowly construe section 4750, subdivision (c), on the ground that a broad immunity "allows health care providers to unconditionally violate an individual's fundamental right to refuse life-prolonging procedures." They are mistaken. That Dr. Ou was immune from damages does not mean that the Duartes were without a remedy for an unjustified refusal to comply. One of the family members could have sought appointment as Mrs. Duarte's conservator (§ 1800 et seq.) and petitioned for equitable relief, enjoining the defendants to either comply with their request or promptly transfer Mrs. Duarte to a provider that would comply (e.g., *Conservatorship of Morrison* (1988) 206 Cal.App.3d 304 [253 Cal.Rptr. 530]). Indeed, the evidence indicates that the Duartes' attorney was preparing just such a petition when Mrs. Duarte died. That she passed away before

[4]Comment to Civil Code former section 2438 in the Report of Assembly Committee on Judiciary on Senate Bill No. 762 (1982-1983 Reg. Sess.), reprinted at 17 California Law Revision Commission Reports (Dec. 1984) pages 894-895. Ten years later, the legislative committee's comment was incorporated into the California Law Revision Commission's comment to Probate Code section 4750. (24 Cal. Law Revision Com. Rep. (Nov. 1994) p. 477.)

that petition was completed and ruled upon means only that the remedy was no longer necessary, not that it never existed.

### 3. *The Immunity Provided by Section 4750 Is Not Contrary to the Natural Death Act.*

Finally, citing Health and Safety Code sections 7186.5, 7190, and 7191, subdivision (a), the Duartes argue that the Natural Death Act (Health & Saf. Code, § 7185 et seq.) precludes the application of the immunity of section 4750, subdivision (c), to this situation. They are mistaken.

Health and Safety Code section 7186.5 provides that "[a]n individual of sound mind and 18 or more years of age may execute at any time a declaration governing the withholding or withdrawal of life-sustaining treatment." (*Id.*, subd. (a).) However, the section is utterly silent on the issue of whether a physician is immune from liability for damages for failing to comply with such a directive.

Health and Safety Code section 7190 provides that "[a]n attending physician or other health care provider who is unwilling to comply with [such a directive] shall take all reasonable steps as promptly as practicable to transfer care of the declarant to another physician or health care provider who is willing to do so." Once again, however, the section is silent as to whether the physician is liable in damages for failing to perform that duty. Moreover, proposed special jury instruction No. 4 concerned the defendants' alleged negligence in refusing to terminate the use of the respirator, not in failing to promptly transfer Mrs. Duarte to a different health care provider.

Health and Safety Code section 7191, subdivision (a), provides: "A physician or other health care provider who willfully fails to transfer the care of a patient in accordance with Section 7190 is guilty of a misdemeanor." Although it does not say so directly, that provision suggests that there is no immunity from civil actions for damages upon a willful failure to transfer the patient. But that section is irrelevant to the propriety of proposed special instruction No. 4, because that instruction concerned the failure to terminate treatment, not the failure to transfer care of the patient.

Even if the proposed instruction had involved the failure to transfer, Health and Safety Code section 7191 would not support liability for damages in the absence of the execution by the patient of a declaration directing the withholding or withdrawal of life-sustaining treatment. The Natural Death Act immunizes the failure to comply with its provisions only "if the physician or health care provider believes in good faith that the action is consistent with [the Natural Death Act] and the desires of the declarant expressed

in the declaration." (Health & Saf. Code, § 7190.5, subd. (b).) By contrast, the immunity under section 4750, subdivision (c), is not conditioned upon the physician's reasons for failing to comply with the attorney-in-fact's instruction. In short, the immunity for failure to comply with the patient's own declaration is circumscribed and conditional, but the immunity granted to those who fail to comply with instructions from the patient's attorney-in-fact is broad and unconditional.

The Legislature was aware of that distinction when it enacted the predecessor to section 4750. (On our own motion, we take judicial notice of the memorandum dated September 19, 1983, by the chief counsel of the Senate Committee on Judiciary, comparing the immunity provisions of the Natural Death Act and of the proposed legislation, which concludes by observing that the broader immunity of the proposed legislation "places less pressure on the doctor to pull the plug than does the Natural Death Act.") Hence, the creation of that distinction does not appear to be accidental. Instead, it suggests an intention by the Legislature to measure the breadth of the immunity according to the source and form of the directive. When the order to withdraw life support comes directly from the patient and is recorded in the patient's declaration, the immunity for failing to comply with that order is narrow. On the other hand, when the order comes, not from the patient, but from the patient's attorney-in-fact, who may or may not have received any specific instructions on that subject from the patient, then the immunity for refusing to comply with that less reliable expression of the patient's intent is broader.

Here, where the patient's wishes were not recorded in writing, and where the patient did not designate any person whom she trusted to interpret her wishes on her behalf, the scope of the immunity must be at least as broad as that afforded to those who refuse to comply with instructions from attorneys-in-fact.

In summary, proposed special jury instruction No. 4 sought to establish that the defendants were negligent in failing to comply with the Duartes' instructions to terminate the use of the respirator. But the only remedy sought for that alleged negligence was damages, and section 4750 provides that the defendants were immune from liability for any damages caused by such a negligent failure to comply with the Duartes' instructions. Therefore, the trial court did not err by refusing to give proposed special jury instruction No. 4.

B.-D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed. Dr. Ou and the hospital shall recover their costs on appeal.

Richli, J., and Ward, J., concurred.

Appellants' petition for review by the Supreme Court was denied September 1, 1999.

---

*See footnote, *ante*, page 849.