Filed 6/5/25  Steiger v. Alameda Health System CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| SHONETTE STEIGER,<br><br>        Plaintiff and Respondent,<br>v.<br>ALAMEDA HEALTH SYSTEM,<br><br>        Defendant and Appellant. | A168216, A168382<br><br>(Alameda County<br>Super. Ct. No. RG19038883) |

Within weeks after Shonette Steiger started working for Alameda Health System (AHS) as a clinical nurse, she began taking medical leave because of an injury to her ankle.  Her employment was terminated a few months later, and she sued AHS for discriminating against her on the basis of disability in violation of the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq. (FEHA)).[1]  After a trial that lasted more than three weeks, the jury found for Steiger on her causes of action for retaliation and disparate treatment on the basis of disability; found against her on her causes of action for failure to provide reasonable accommodation and failure to engage in the interactive process; and found against AHS's claim that budget constraints were a substantial motivating reason for its decision to

_____

[1] Statutory references are to the Government Code unless otherwise specified.

1

terminate Steiger's employment.  The jury awarded Steiger a total of $465,428.19 in past and future economic damages.

AHS appeals from the judgment entered on the verdict and from the denial of its posttrial motions, arguing that the trial court made instructional and evidentiary errors resulting in a logically inconsistent verdict that is not supported by the evidence, and that the trial court erred in upholding an invalid verdict.  We will affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *Background on Principles of Appellate Practice and Procedure*

It is a fundamental principle of appellate review that a judgment or order challenged on appeal is presumed to be correct, and it is the burden of the appellant to affirmatively show error (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564) and to provide legal argument showing how the error was prejudicial.  (*Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 963.) To meet that burden an appellant must submit an opening brief that includes "a summary of the significant facts limited to matters in the record."  (Cal. Rules of Court, rule 8.204(a)(2)(C); see also *id.*, rule 8.204(a)(1)(C) [brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"].)  Like the statement of facts, an appellant's arguments must be supported "by appropriate reference to the record, which includes providing exact page citations"; we are not required to search the record for evidence and we may disregard unsupported factual assertions.  (*Air Couriers International v. Employment Development Dept.* (2007) 150 Cal.App.4th 923, 928 (*Air Couriers*).)  The failure to provide adequate citations to the record forfeits a claim of error.  (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856 (*Duarte*).)

AHS's factual summary and many of its arguments include purported statements of fact that are not supported by adequate—or sometimes any—citations to the record on appeal, which is voluminous.  The need for an appellant to provide exact citations to the record is of particular importance in a case like this one, where the appellant's appendix exceeds 4,500 pages and the reporter's transcript, which includes pretrial and posttrial proceedings as well as the lengthy trial, comprises 27 volumes.  Moreover, the summary of facts in AHS's opening brief focuses almost entirely on evidence supporting AHS's view of the case, which is that Steiger was terminated as part of a reduction in force that was necessary because of budget cuts, while largely ignoring evidence supporting Steiger's view, which is that she was terminated because she took medical leave.  (See *In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1531 [briefs should state critical facts and evidence accurately and fairly; issues and arguments can be waived by material omissions].)

B.    *Steiger's Employment at AHS*

AHS hired Steiger to work as a Clinical Nurse II in the Women's Clinic at Highland General Hospital.  Steiger's first day of work was October 9, 2017.  Within a month of starting the job, Steiger's ankle, which she had injured several months earlier, became swollen.  It hurt to put weight on it, and during October 2017 Steiger took two days leave without pay on account of the pain.  Her symptoms returned: she took leave without pay for a week in mid-November, and provided a note from her doctor certifying her disability.  After that leave, she worked through Christmas, but her condition worsened and she took leave without pay until mid-January 2018, again providing information from her doctor.

3

Steiger returned to work in January 2018 with modified duties; then on January 31, she saw an orthopedist who took her off work for one month.[2] Steiger remained on leave without pay for the next six months. Shortly before the end of each scheduled period of leave, in February, March, April, May, June, and July, Steiger submitted certification of her disability from her medical providers, and her leave was extended.

In mid-July, Steiger's doctor authorized her to return to work on August 13. Steiger provided documentation to her immediate supervisor, Angie Smith, and to Rumana Hussain, the practice administrator for the Women's Clinic and reported that her doctor would "issue detailed modified work duty restrictions" so she could return to work on August 13. On July 27, preparing for her return, Steiger went to the hospital to take a tuberculin test and met with Hussain while she was there; they discussed Steiger's returning to work on August 13.

On July 30, AHS sent Steiger a letter, signed on behalf of Smith, stating that she was "hereby released from probationary employment with AHS effective August 10."[3]

C.    *AHS's Decision to Terminate Steiger's Employment*

As early as December 2017, Steiger's absence inconvenienced her supervisor, Smith, who expressed frustration that Steiger "has been having a lot of health issues." Smith, who had to leave her vacation early to come back to work, testified that she lost trust in Steiger because of her calling in sick, and that she "suggested that we let [Steiger] go so we can get someone that is going to be there."

---

[2] Subsequent dates are in 2018 unless otherwise specified.

[3] The handwriting in the signature block consists of initials and the words "For:  Angie Smith."

4

In early February 2018, Hussain sent an email to AHS's human resources department asking to recruit for a new nurse to do the work that Steiger was hired to perform, because her current budget did not allow her to hire someone new while Steiger was an employee.

Anthony Uribe, a human resources employee at AHS, testified that Hussain contacted him in May about Steiger. Hussain told him that she had an employee who was currently on leave and that she wanted to "get ourselves to a better state" and was looking for "the best way that we can arrive at an outcome given her circumstances with Ms. Steiger." Uribe testified that he brought Priscilla Hood, the manager for labor relations, into the conversation, who said that the best approach would be releasing Steiger from probation, and who made no mention of a reduction in force.

Kathryn Horner, the Vice President for Ambulatory Care Services at AHS, testified that in the spring of 2018 she was instructed to cut about three positions in the Women's Clinic for the fiscal year running from July 1, 2018 to June 30, 2019. Horner told the jury that Hussain, who in her role as practice director for the Women's Clinic reported to Horner, proposed reducing the number of nurses from four to three as part of the effort to meet the budget demand. According to Horner, Hussain's assessment was that the area did not need four nurses, although Hussain had also expressed concerns about not having enough staff or nurses to support the patients. Hussain had not provided Horner with any reason other than the budget demand for cutting the number of nurses from four to three, nor had she shared with her any data to support the decision. Horner testified that she ratified and approved the decision to cut the nursing position, but the recommendation came from Hussain. Asked whether Hussain told her that Steiger's position would be eliminated, Horner responded, "So when we proposed the

elimination in the position, it was like a budgetary—it was a budgetary decision. The reductions in force are handled per the—the memorandum of understanding with our union contract. So we didn't make that decision based off of—that's not our decision to make." Horner admitted that both she and Hussain were aware that Steiger was the least senior registered nurse in the clinic. Asked whether she understood that Steiger would be laid off as a result of reducing the number of nurses in the clinic, Horner responded, "I think we needed HR's support to help us through, make sure that we were complying with both the [union contract] and with the legal HR issues at hand with having somebody out on leave." Horner also testified that in the end, the only position in the Women's Clinic that was affected by the budget cut was Steiger's, and that despite Steiger being laid off, the number of full time equivalents in the Women's Clinic remained the same in the 2018-2019 fiscal year as the previous year.

Although Horner's testimony suggested that Steiger was laid off as part of a larger reduction in force for the 2018-2019 fiscal year, there was contrary evidence. Chamayne Pierce, who was AHS's senior human resources business partner in 2018, created the spreadsheet of employees affected by the reduction in force. She testified that Steiger was released "for performance reasons, not having anything to do, in her particular case, with budget." And, Andre Spearman, a union field representative who was a member of the Workforce Planning Committee that implemented the reduction in force, testified that Steiger and her position were not part of the reduction in force.

On July 30, the same day that AHS sent Steiger's termination letter, Hussain initiated a requisition to hire a nurse to perform the duties that Steiger had been hired to perform.

D.     *Events After AHS Sends Steiger's Termination Letter*

On August 6, a week after AHS sent Steiger's termination letter, and a week before she was scheduled to return to work, Steiger's physician extended her work restriction to mid-September. That same day, Steiger received the certified letter stating that her employment had been terminated.

Steiger's union filed a grievance on her behalf alleging discrimination. A meeting about the grievance was held in October 2018, and attended by Steiger, union field representative Spearman, Soraya O'Sullivan (a shop steward), and Steve Kilgore, AHS's "Director of Nursing for Ambulatory." After the meeting, Kilgore sent a letter denying the grievance. The letter stated, "Ms. Steiger was released from her probationary period due to the reduction in force process ongoing at that time. The Women's Clinic reduced one [Clinical Nurse II Full Time Equivalent], which resulted in Ms. Steiger's position being eliminated. Her probation period ending was not related to her job performance but rather to a reduction in force."

This was the first time Steiger was told that her termination was related to a reduction in force. And at trial, Steiger presented evidence that Kilgore's statement was untrue, including a series of emails from AHS human resources employee Uribe to Chamayne Pierce, who was his supervisor, stating: "Steve Kilgore was not involved and simply misspoke." Uribe reported that Hussain "believed [Steiger] could not perform the duties described in her job description," and that Hussain "had requested insight as to what her options were through Labor but no response was received." Uribe testified that Kilgore's statement in the letter to Steiger was inconsistent with the communications between Uribe and Hussain about Steiger—communications in which Kilgore had not participated.

7

Steiger's injury improved over time. Her physician approved her for work with modified activity effective October 8 and released her to full activity effective January 7, 2019. Medical records introduced at trial show that the doctor's January 2019 assessment was based on his previous examination of Steiger, her medical records, a telephone conversation with her, and an email in which Steiger reported that she was able to "ambulate distance without pain, swelling, discomfort."

After Steiger was released to full activity, she was employed at San Francisco State University as an adjunct clinical professor in the nursing department. There she taught public health nursing theory on campus and taught obstetrics clinicals at various hospitals, which, she testified, required her to do "[p]retty much everything that is required of a labor and delivery nurse." She testified that she was never unable to do that job because of her ankle injury. She subsequently held other positions that included clinical work, and required her to be on her hands and knees, as well as on her feet. She testified that her ankle healed without surgery, and that since she was released to full activity in January 2019 she regularly hiked and danced, and she traveled extensively, including to destinations where she hiked.

E.    *Proceedings in the Trial Court*

Steiger sued AHS alleging causes of action for disability discrimination based on disparate treatment in violation of section 12940, subdivision (a); failure to engage in the interactive process in violation of section 12940, subdivision (n); failure to provide reasonable accommodation in violation of section 12940, subdivision (m); and retaliation in violation of section 12940, subdivision (h).

The case was heard by a 12-person jury in a trial that was conducted over Zoom on multiple days in February and March 2023. Ten witnesses testified, and 91 exhibits were admitted into evidence.

The jury returned its verdict after deliberating for several hours over the course of two days. The jury found in Steiger's favor on her causes of action for disparate treatment and retaliation, and found against her on her causes of action for failure to accommodate her disability and failure to engage in the interactive process. The jury specifically found that AHS's budgetary constraints were not a substantial motivating reason for its decision to terminate Steiger's employment. The jury awarded Steiger $355,428.19 in past economic losses, $110,000 in future economic losses, and no non-economic damages.

After judgment on the verdict was entered for Steiger, AHS moved for judgment notwithstanding the verdict (JNOV) or in the alternative a new trial, arguing that the evidence did not support the verdicts against AHS and that the verdicts were inconsistent and therefore illegal and required a new trial. The trial court denied the motions and AHS timely appealed from the judgment and the order denying the posttrial motions. We granted AHS's unopposed motion to consolidate the appeals.

## DISCUSSION

AHS argues that the judgment must be reversed because the trial court made prejudicial evidentiary rulings and errors in instructing the jury; entered an inconsistent verdict; erred in denying the motion for JNOV; and erred by upholding an invalid verdict when it should have sent the jury back for further deliberation.

9

A.      *Evidentiary Rulings*

AHS contends that erroneous rulings by the trial court allowed Steiger to present inadmissible testimony from three of her witnesses: Chamayne Pierce and Anthony Uribe, both human resources employees at AHS who were called as adverse witnesses, and union representative Andre Spearman. AHS also contends that an erroneous ruling prevented AHS from presenting "important admissible" testimony from AHS employee Grace Messina.

1.      *Standard of Review*

We apply the abuse of discretion standard in reviewing a trial court's evidentiary rulings, which means "we will not reverse absent ' "a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Pilliod v. Monsanto Company* (2021) 67 Cal.App.5th 591, 630 (*Pilliod*).) Reversal requires AHS to show error and also show a reasonable probability that it would have received a more favorable result at trial if the error had not been made. (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 447 (*Christ*).)

2.      *Analysis*

a.      *Anthony Uribe and Chamayne Pierce*

AHS argues in a conclusory fashion, and without any citations to the record, that Uribe's testimony should have been excluded as inadmissible hearsay. AHS has forfeited any claim of error by the trial court with respect to Uribe's testimony. In its opening brief, AHS does not identify any of Uribe's purportedly inadmissible testimony, and does not identify any objection it made to his testimony or any evidentiary ruling that concerned his testimony. (See *In re S.C.* (2006) 138 Cal.App.4th 396, 406 [as a general matter, to preserve issue for appeal party must raise an objection in the trial court and "cite to the record showing exactly where the objection was made"];

10

*Duarte*, *supra*, 72 Cal.App.4th at p. 856 [contention of error forfeited by failure to provide adequate citations to the record].)

As for Pierce, AHS states that its motion in limine to exclude her testimony was "denied." But AHS does not disclose that the trial court never reached the merits of the motion: the court declined to accept the motion because it was filed months after the deadline. AHS also does not disclose that the trial court's refusal to accept the motion was without prejudice to AHS raising objections to Pierce's testimony during trial. AHS presents no argument or authority to suggest that the trial court abused its discretion in declining to accept its motion in limine, so we do not consider that issue further. (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52 (*Allen*) [claims not supported by meaningful argument and citation to authority may be treated as forfeited].) Further, because AHS does not identify any objection it made to Pierce's testimony at trial or any evidentiary ruling made by the court in the course of her testimony, any claim of error in that regard has been forfeited. (*Air Couriers*, *supra*, 150 Cal.App.4th at p. 928; *In re S.C.*, *supra*, 138 Cal.App.4th at p. 406; *Duarte*, *supra*, 72 Cal.App.4th at p. 856.)

      b.    *Andre Spearman*

Spearman testified that he was a field representative employed by Steiger's union whose job duties included negotiating and enforcing union contracts. In its opening brief, AHS asserts that Spearman's testimony was "completely irrelevant," but AHS does not identify any objections it made to Spearman's testimony or any motions to strike. Accordingly, and contrary to AHS's contention, AHS has not shown that the trial court's "evidentiary decisions permitted Ms. Steiger to present inadmissible testimony"

11

(capitalization omitted) from Spearman.[4] (*Air Couriers*, *supra*, 150 Cal.App.4th at p. 938; *In re S.C.*, *supra*, 138 Cal.App.4th at p. 406; *Duarte*, *supra*, 72 Cal.App.4th at p. 856.)

          c.     *Grace Messina*

AHS identified Grace Messina, its financial planning and analysis director, as a witness to testify about its "budget and policies and procedures for budgeting."

Steiger filed a motion in limine to exclude Messina's testimony, arguing that Messina had not been timely disclosed as a witness and lacked personal knowledge related to the case, and that her testimony would be duplicative of testimony from Kathryn Horner, who testified in her deposition about AHS's budget, its policies, and her personal knowledge of the budget for Steiger's department during Steiger's employment and at the time of her termination. Messina, who began her employment with AHS in 2021, years after Steiger had been terminated, testified at her pre-trial deposition that she had no personal knowledge about the fiscal year 2018-2019 budget. She also testified that she knew nothing about a 2018-2019 reduction in force, and nothing about the processes for a reduction in force. Messina testified that any knowledge she had about the 2018-2019 budget derived from her asking other employees for information; they referred her to a calendar, which she "glanced" at, and which was not produced in discovery. Further, at her

---

[4] In a string citation to portions of Spearman's trial testimony, AHS includes an unexplained reference to a 22-page-long portion of an attorney declaration it filed in support of a motion in limine to exclude testimony from union representatives. In arguing that that the trial court improperly permitted Spearman to testify, AHS does not mention the motion in limine (which was denied), much less argue that the denial of the motion constituted an abuse of discretion. Any such arguments have therefore been forfeited.

deposition Messina was not familiar with budgeting documents from the time Steiger was employed that had been produced in discovery and could not say whether they were accurate.

In opposing the motion in limine, AHS argued that it identified Messina as a witness as soon as it was required to do so; that Messina had personal knowledge of AHS's annual budgeting process and procedures; and that Messina had testified in other litigation as AHS's person most knowledgeable about AHS's operating budget during the time Steiger was employed. AHS argued that Messina would provide "critically important" testimony as to the timing of the budget process in the year when Steiger was terminated, and that she could testify as to "the nature of . . . the budget process as it existed then."

During the hearing on the motion, the trial court responded to AHS's argument on the timing issue by stating, "I read her [deposition] transcript. She doesn't have that knowledge." The court expanded on that point in granting the motion, stating that Messina "had an opportunity to testify as to some of the details in her deposition, and just didn't have any detail— personal knowledge or not. So at this time, I am going to exclude Ms. Messina."

On appeal AHS suggests that Messina's testimony was excluded because she had not been timely identified, and devotes the bulk of its argument to that issue. AHS says nothing to suggest that the trial court erred in concluding that Messina lacked knowledge of the matters as to which she would be called to testify and accordingly fails to show that the trial court abused its discretion in granting the motion in limine.

Nor does AHS show that it was prejudiced by the ruling. AHS contends that because a "critical element" of its defense was showing that Steiger's

13

position was eliminated as a result of budget cuts, it was "critical . . . to present evidence to the jury about those budget cuts" and "[a] different result would have been probable if the trial court had heard this testimony." AHS does not tell us what "this testimony" from Messina would have been, beyond stating (without citation to the record) that Messina would have testified "about established policies and procedures, and established practices in [the AHS] Finance department." In the absence of any information about what testimony Messina might have provided that was not included in the testimony of other witnesses or how Messina's testimony would have led to a more favorable result for AHS, AHS fails to show that it was prejudiced by the trial court's decision to exclude Messina as a witness. (*Christ, supra*, 2 Cal.App.5th at p. 447.)

B.    *Jury Instructions*

AHS argues that the trial court erred by failing to clarify the law in response to a jury question, by declining to give two special instructions that AHS proposed, and by failing to instruct the jury on "cat's paw" liability.

We review challenges to the propriety of jury instructions de novo, " ' "evaluat[ing] the instructions given as a whole, not in isolation." ' " (*A.H. v. Tamalpais Union High School Dist.* (2024) 105 Cal.App.5th 340, 349 (*A.H.*).) " 'A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence,' " but " ' "[e]rror cannot be predicated on the trial court's refusal to give a requested instruction if the subject matter is substantially covered by the instructions given." ' " (*Ibid.*) Instructional error in a civil case is prejudicial "if it is reasonably probable the error affected the verdict." (*Ted Jacob Engineering Group, Inc. v. The Ratcliff Architects* (2010) 187 Cal.App.4th 945, 962.)

14

1.     *Questions from Jury During Deliberation*

a.     *Additional Background*

Early in the deliberations, the jury posed two questions.  The first was: "The jury is kindly requesting some clarification regarding a question on verdict form number 2, question number 3, what is the definition of reasonable accommodation and what is the definition of essential job duties according to the laws that apply to this case?"[5]  The court proposed answering the question by referring the jury to the instructions that defined "reasonable accommodation" and "essential job duties"; and the parties agreed this was the appropriate response.

The jury's second question, sent 15 minutes after the first, read as follows:  "Another question to add on to our previous question:  What is the time frame we should be using as a reference?  Is this applying to the time of termination or the duration of her employment?"  The court proposed the following response:  "In answering question number 3 on verdict form 2, the jury should read all four questions together in considering the evidence."  The court explained that the response would lead the jurors to look at question four, which referred them specifically to the decision to discharge Steiger. The court then heard argument from counsel on the matter, during the

---

[5] Verdict form two addressed Steiger's disparate treatment claim.  The questions on the form were:  (1) "Did Alameda Health System know that Shonette Steiger had a physical condition that limited her ability to work?" (2) "Was Shonette Steiger able to perform the position's essential job duties without an accommodation?"  (3) "Was Shonette Steiger able to perform the position's essential job duties with reasonable accommodation for her physical condition?"  (4) "Was Shonette Steieger'[s] physical condition a substantial motivating reason for Alameda Health System's decision to discharge Shonette Steiger?" and (5) "Was Alameda Health System's conduct a substantial factor in causing harm to Shonette Steiger?"

15

course of which both the court and AHS acknowledged that it was not clear whether the jury's question did in fact refer to question three on verdict form two.

Steiger proposed a response instructing the jurors to "look at all the evidence." AHS expressed concern that the jury would consider evidence pertaining to the time after the termination, as opposed to during Steiger's employment, and argued that the "most accurate response under the law . . . would be 'at the time of termination.' "[6] The trial court pointed out that the jury instruction for the disparate treatment claim addressed the "decision to discharge," as reflected in question four on the verdict form, and that AHS made the decision on July 30, before the termination itself, which was in August. The court also observed that the jury's question was "pretty vague," and that the jury appeared to be asking about the verdict form, not the law. AHS argued that it would be helpful for the jury to be referred to the jury instruction on the elements of the disparate treatment claim as well as to the verdict form.

The court responded to the jury with an alternative to its original proposed answer that was suggested by AHS: "In answering question 3 on verdict form 2, the jury should read all four questions together with" jury instruction 2540. That instruction was modeled on CACI No. 2540 (Disability Discrimination—Disparate Treatment—Essential Factual Elements). The court and AHS agreed that the jurors would likely ask another question if the

---

[6] None of the verdict forms contains the word "termination." The word appears once in the jury instructions: instruction 2509, modeled on CACI No. 2509 ("Adverse Employment Action" Explained), stated that Steiger was required to prove she was subjected to an adverse employment action, and instructs that "[a]dverse employment actions are not limited to ultimate actions such as termination or demotion."

16

answer was not clear, and AHS observed, "It does seem that they're asking questions before finishing the reading a little bit here."  The jury did not seek further clarification on the issue, although it did ask for other information as the deliberations continued.

        b.    *Additional Applicable Law*

Once a jury has begun deliberating, the trial court has a duty to answer the jury's questions as to the law to be applied.  (See Code Civ. Proc., § 614 ["if [members of the jury] desire to be informed of any point of law arising in the cause, they may require the officer to conduct them into Court"; "the information required must be given in the presence of, or after notice to, the parties or counsel"].)  The court  is "duty bound to give supplemental instructions if additional guidance is necessary to give the jury ' "a full and complete understanding of the law applicable to the facts." ' "  (*Flores v. Liu* (2021) 60 Cal.App.5th 278, 289.)  Accordingly, if the original instructions given to the jury are "inadequate, and the jury asks questions indicating their confusion and need for further explanation, failure to give proper additional instructions is usually reversible error."  (*Sesler v. Ghumman* (1990) 219 Cal.App.3d 218, 227 (*Sesler*).)

        c.    *Analysis*

AHS argues that the trial court's response to the second jury question constitutes instructional error that requires reversal.  AHS contends that the jury expressed confusion about a purely legal question, specifically the time at which a plaintiff must be able to perform essential functions of the job with or without reasonable accommodation, and that the court was required to respond to the jury's question by answering, "at the time of termination."

AHS does not persuade us that the trial court erred.  Even if the jury's second question reflected confusion about a purely legal issue, AHS fails to

17

show that the trial court's response to the question was inadequate or inappropriate. The trial court referred the jury to the verdict form for the disparate treatment claim and the specific jury instruction with the elements of that claim. AHS did not argue in the trial court and does not argue on appeal that the jury instruction to which the jury was referred was incorrect or "inadequate." (*Sesler*, *supra*, 219 Cal.App.3d at p. 227.) And the response apparently satisfied the jury, as reflected in their not asking for any further information on the point.

### 2. *Special Instructions Proposed by AHS*

#### a. *Additional Background*

After plaintiff presented her case-in-chief, AHS proposed two additional special jury instructions. The trial court refused to accept them because they were not timely submitted. (See Code Civ. Proc., § 607a [before the first witness is sworn, counsel must submit proposed jury instructions "covering the law as disclosed by the pleadings"].) AHS contends this was error.

#### b. *Additional Applicable Law*

Although proposed jury instructions covering the law as disclosed by the pleadings are to be delivered to the court before the first witness is sworn, instructions addressing questions of law that were not disclosed in the pleadings but are developed by the evidence may be proposed until the beginning of argument. (Code Civ. Proc., § 607a.) And if issues are raised in argument that are not "covered by instructions given or refused, the court may, on request of counsel, give additional instructions on the subject matter thereof." (*Ibid.*)

#### c. *Proposed Instruction on Exemption from Layoffs*

After Steiger presented her case-in-chief, AHS proposed a special instruction stating, "Shonette Steiger must show that her termination during

18

leave was in violation of the law. Under California law, employees on a leave of absence at the time of a reduction in force do not receive special protection from termination as part of that reduction in force." We understand AHS to argue that the instruction was timely because it dealt with a "question[ ] of law developed by the evidence and not disclosed by the pleadings." (Code Civ. Proc., § 607a.) AHS asserts that the instruction was necessary because the trial court "permitted significant testimony" from Steiger and union representative Spearman "suggesting employees on leave were immune to layoffs."[7] We are not persuaded.

In support of its argument, AHS cites a brief exchange in which Steiger answered questions posed to her by AHS. Asked whether it was her "belief" that being on leave meant she could not be laid off, Steiger stated that it was, and remained, her "impression" that she could not be laid off while she was on leave for a verifiable medical condition. Asked again about her "belief," Steiger responded: "That was my belief, but I'm not an attorney. I'm a nurse." This is not "significant testimony suggesting employees on leave [are] immune to layoffs": AHS asked specifically about Steiger's "belief," and Steiger responded with information about what she characterized as her "impression" and "belief," as well as a disclaimer about her legal knowledge. AHS does not identify any other testimony from Steiger to support its point.

AHS also cites testimony from Spearman, but nowhere in the cited passages did Spearman state or suggest that employees on leave are immune from layoffs. To the contrary, Spearman testified that under the agreement

---

[7] AHS also contends that Steiger "argued extensively that it was improper to terminate her while she was on leave." We disregard this contention, which is not supported by any citation to the record. (*Air Couriers*, *supra*, 150 Cal.App.4th at p. 928.)

19

covering AHS, layoffs are conducted by seniority and a person's medical condition does not affect seniority.

Thus, AHS's argument fails because it is based on an unsupported premise about the testimony presented at trial. Moreover, the law applying to Steiger's termination was " ' "substantially covered by the instructions that were given." ' " (*A.H.*, *supra*, 105 Cal.App.5th at p. 349.) The jury was given instructions modeled on CACI No. 2505 (Retaliation—Essential factual Elements (Gov. Code, § 12940(h))) and CACI No. 2540 (Disability Discrimination—Disparate Treatment—Essential Factual Elements), which set out what the jury was required to determine about Steiger's termination for her to prove her claims. The jury was also instructed that Steiger's employment was probationary, and that "an employer may discharge a probationary employee for no reason, or for good, bad, mistaken, unwise, or even unfair reasons, as long as its action is not for a discriminatory or retaliatory reason," modeled on CACI No. 2513 (Business Judgment for "At-Will" Employment). In these circumstances, AHS has not shown instructional error by the trial court.

### d. *Proposed Instruction on Shifting Reason*

The second special instruction that AHS proposed after Steiger presented her case in chief was: "Shonette Steiger may show a shifting reason for her termination as evidence of discrimination or retaliation. The shifting reason must be that of a decision-maker for the defendant. In order to establish a shifting reason, the reasons shown must be incompatible."

AHS asserts on appeal that the instruction was necessary because the court permitted "extensive testimony" from AHS employees, including specifically Pierce and Uribe, who were not involved in the budget

20

reductions.[8]  According to AHS, Steiger argued to the jury that their testimony showed that AHS had shifting reasons for the layoffs and how they were implemented, and further argued that the shifting reasons were evidence of pretext sufficient to support a discriminatory motive.  This argument has been forfeited, because AHS fails to provide citations to the record to support any of its assertions.  (*Air Couriers*, *supra*, 150 Cal.App.4th at p. 928; *Duarte*, *supra*, 72 Cal.App.4th at p. 856.)

  3. *Withdrawal of "Cat's Paw" Instruction*

 At some point in the pretrial proceedings, Steiger proposed an instruction modeled on CACI No. 2511 (Adverse Action Made by Decision Maker Without Animus (Cat's Paw)).[9]  After AHS had presented testimony from all but one of its witnesses, Steiger withdrew the proposed instruction.  AHS said it had no objection:  "If they're not going to rely on it, then I don't think it should be read to the jury."

 AHS argues that Steiger invited error by withdrawing the instruction and then, after the court had read the agreed-upon instructions to the jury, arguing cat's paw liability in her closing argument.  AHS has forfeited this claim of error because it did not raise the issue in the trial court:  it did not

---

 [8] AHS does not describe or summarize Uribe's or Pierce's testimony in its opening brief, except to state, without citation to the record, that Pierce testified that Steiger was released from probation as part of a reduction-in-force.

 [9] As reflected in the Directions for Use for CACI No. 2511, the "cat's paw" rule applies when the person who took the adverse employment action against the employee (the decision-maker) did not act out of any improper animus, but instead acted on information provided by *another* person who acted out of improper animus with the objective of causing the adverse employment action.  The decision-maker in this situation is the "cat's paw" of the person with animus.

object to any purportedly improper statements in closing argument; it did not ask the court to restore the cat's paw instruction; and it did not raise this issue in its new trial motion. (See *Martinez v. Rite Aid Corp.* (2021) 63 Cal.App.5th 958, 972, fn. 4 [party "cannot claim error in the failure to give a jury instruction it did not request"]; *In re S.C.*, *supra*, 138 Cal.App.4th at p. 406 [party must raise objection in the trial court to preserve issue for appeal].) AHS does not address its failure to object during closing argument or its failure to raise the issue in its posttrial motion, but contends that it had no opportunity to ask the court to restore the cat's paw instruction because the issue was raised in closing argument, a contention we reject because section 607a of the Code of Civil Procedure authorizes a party to request jury instructions based on issues that are raised in argument and authorizes the trial court to give additional instructions on the relevant subject matter.

C. *Consistency of the Verdict*

AHS claims that the jury's verdict is logically inconsistent, and that the inconsistency both shows that the trial court's purported instructional errors were prejudicial and constitutes an independent ground for reversal.

1. *Applicable Law*

"A special verdict is inconsistent if there is no possibility of reconciling its findings with each other." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357.) We review the verdict de novo to determine whether the findings are inconsistent. (*Id.* at p. 358.) If findings are contradictory on material issues, and the determination of those issues is necessary to sustain the judgment, we must reverse for a new trial. (*Ibid.*)

2. *Analysis*

AHS asserts that the jury's verdict displays "two critical inconsistencies." Although the argument is not supported by any citations to

22

FEHA or the case law interpreting it, we understand AHS to contend that the verdicts for Steiger on her retaliation and disparate treatment claims are inconsistent with the verdicts for AHS on the accommodation and interactive process claims.

We begin with AHS's contentions about the retaliation verdict. In answering the questions on the verdict form, the jury found that Steiger's requesting an accommodation and/or taking leave from work was a substantial motivating reason for AHS's decision to discharge her. In answering the questions on verdict forms for reasonable accommodation and interactive process, the jury found that AHS did not fail to provide Steiger with reasonable accommodation and did not fail to participate in a timely, good-faith interactive process to determine whether reasonable accommodation could be made. AHS contends that the retaliation verdict "directly conflicts" with the jury's findings in favor of AHS on the reasonable accommodation and interactive process claims, because "[e]nding the interactive process via a termination would necessarily create liability for a failure to engage in the interactive process." The argument assumes that the jury found that AHS ended the interactive process by means of a termination, but AHS points to nothing in the record to support that assumption. To the contrary, it is consistent for a jury to find that AHS engaged in the interactive process with Steiger (and that as a result of engaging in that process, AHS provided reasonable accommodation by allowing Steiger to take leaves of absence) and that AHS nevertheless *retaliated* against Steiger by deciding to terminate her employment on July 30, 2018.

AHS's argument concerning the disparate treatment claim fares no better. In answering the questions on the verdict form for that claim, the jury found that Steiger could not perform the essential duties of her position

without accommodation but could perform them with reasonable accommodation for her physical condition. The jury also found that Steiger's physical condition was a substantial motivating reason for AHS's decision to discharge her. And in answering the questions on the verdict form for the reasonable accommodation claim, the jury found that Steiger could perform the essential job duties with reasonable accommodation (just as it found in connection with the disparate treatment claim), and that AHS had not failed to provide reasonable accommodation; therefore AHS was not liable under the cause of action. Contrary to AHS's assertions, these verdicts are not inconsistent: there is no inconsistency between a finding that reasonable accommodation was provided and a finding that Steiger's physical condition was nevertheless a motivating factor for the decision to discharge her. As the trial court observed in denying AHS's motion for new trial, "it is entirely consistent for a jury to find that [AHS] did not fail to provide reasonable accommodations during [Steiger's] term of employment, yet also discriminated against her and retaliated against her based on her disability by terminating her employment (because providing the reasonable accommodation of extended leave had become rather inconvenient for the employer)."

D.    *Denial of JNOV*

AHS argues that because the jury's verdict was not supported by substantial evidence, the trial court erred by denying its motion for JNOV.

1.    *Applicable Law*

We review a ruling on a motion for JNOV " 'us[ing] the same standard the trial court uses in ruling on the motion, by determining whether it appears from the record, viewed most favorably to the party securing the verdict, that any substantial evidence supports the verdict.' " *Pacific*

24

*Corporate Group Holdings, LLC v. Keck* (2014) 232 Cal.App.4th 294, 309.) In a substantial evidence challenge, " 'we are bound by the "elementary, but often overlooked principle of law that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below.' [Citations.] A fundamental corollary to the substantial evidence rule is the ' "conflicting inference" rule,' by which 'the appellate court must indulge all *reasonable* inferences that may be deduced from the facts *in support of the party who prevailed* in the proceedings below.' [Citations.] Thus, '[e]ven if the facts were admitted or uncontradicted, the appellate court will not substitute its deductions for the reasonable inferences actually or presumptively drawn by the trial court.' " (*Pilliod*, *supra*, 67 Cal.App.5th at p. 621.)

2. *Whether Steiger Could Perform the Essential Duties of her Job*

In finding for Steiger on her disparate treatment claim, the jury concluded that Steiger was not able to perform the essential duties of her position without an accommodation, but that she was able to perform them with reasonable accommodation. AHS contends there is no substantial evidence that Steiger could perform the essential duties of her job at the time she was terminated, whether with or without accommodation. But the record shows substantial evidence that when AHS terminated her employment, Steiger could perform the essential duties of her job with the reasonable accommodation of an extension of her leave of absence. (See *Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 263 ["[h]olding a job open for a disabled employee who needs time to recuperate or heal is in itself a form of reasonable accommodation and may be all that is required where it appears

25

likely that the employee will be able to return to an existing position at some time in the foreseeable future"].)

Specifically, Steiger presented evidence showing that on July 30, 2018, when AHS terminated her employment, she was on leave until August 13, with the expectation that she would return to work with modified work restrictions. She presented evidence that although her doctor later extended her work restriction beyond August 13, she was cleared to work with modified activity effective October and with full activity effective January 2019. Contrary to AHS's assertion that Steiger offered "mere speculation that she could return to work," Steiger's testimony established that she recovered from her ankle injury and returned to the workforce, taking a job in which she performed clinical work for 12-hour shifts.

3.    *Whether Discrimination or Retaliation Was a Substantial Motivating Factor for the Decision to Discharge Steiger*

The jury found that Steiger's physical condition and her "requesting an accommodation and/or taking leave from work" were substantial motivating reasons for AHS's decision to discharge her. AHS insists that there was "no evidence of improper motive," and that uncontradicted evidence shows that Steiger's position was eliminated because "Horner alone made the decision" to eliminate Steiger's position because of a budget gap and a drop in demand for procedures at the Women's clinic.

To the contrary, Steiger presented substantial evidence to support the jury's findings of motive, including Smith's testimony that she suggested Steiger be let go because of her calling in sick; Uribe's testimony that Hussain sought to "get ourselves to a better state" and "arrive at an outcome" with respect to Steiger; Pierce's testimony that Steiger's termination was not related to the budget, but was for "performance reasons"; Spearman's testimony that Steiger and her position were not part of the reduction in

26

force; Horner's testimony that Hussain recommended cutting Steiger's position; and evidence that on the very same day that Steiger was terminated, Hussain sought to create a new position for a nurse to perform the duties of Steiger's position. This evidence supports an inference that AHS decided to terminate Steiger to address Hussain's expressed concerns that Steiger had been on leave because of her disability. (See *DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 551 [a showing "that a significant participant in an employment decision exhibited discriminatory animus is enough to raise an inference that the employment decision itself was discriminatory, even absent evidence that others in the process harbored such animus"].)

In the face of all the evidence, the jury was not bound to accept AHS's position that Horner alone made the decision to cut Steiger's position, nor its position that budgetary constraints were a substantial motivating reason for the decision to discharge here.

4.     *Whether Evidence Supports a "Cat's Paw" Theory*

AHS argues that at trial Steiger sought to establish the requisite discriminatory or retaliatory animus by relying on a cat's paw theory, and that there is no evidence to support the application of such a theory. We need not reach this argument, which concerns a theory of liability about which the jury was not instructed. As we have explained, the jury was presented with substantial evidence to support its findings that AHS's decision to discharge Steiger was substantially motivated by Steiger requesting an accommodation and/or taking leave from work (for the retaliation claim) and by Steiger's physical condition (for the disparate treatment claim), which underlie the verdicts in Steiger's favor.

E.    *Validity of the Verdict*

Relying on an incomplete account of the proceedings below, AHS asserts that the trial court erred by "rushing through the . . . polling process," by refusing to send the jury back for further deliberation, and by upholding the verdict even though more than one-fourth of the jury disagreed with it. The record does not support any of these assertions.

1.    *Applicable Law*

When a civil jury is composed of 12 jurors, as was the case here, "it is sufficient if *any* nine jurors arrive at each special verdict, regardless of the jurors' votes on other special verdict questions." (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 255.) Either party may require that the jury be polled. (Code Civ. Proc., § 618.) If more than one-fourth of the jurors disagree with the verdict as returned, "the jury must be sent out again, but if no disagreement is expressed, the verdict is complete and the jury discharged from the case." (*Ibid.*)

2.    *Additional Factual Background*

After the jury returned its verdict, AHS requested the jury be polled. The court began polling by show of hands starting with the first of the six verdict forms, which addressed the retaliation claim, moving question by question through the form. Polling on the second verdict form, which addressed the disparate treatment claim, required the clerk to count the number of jurors who voted "yes" on the question whether AHS's conduct was a substantial factor in causing harm to Steiger. The clerk sought to confirm whether Juror Nos. 5, 6, 10, and 11 had not raised their hands (which would mean that they voted "no"). Juror No. 10 immediately apologized for not raising their hand, at which point the court asked for an individual poll on the question by voice vote. The voice vote confirmed that Juror No. 10 had

28

voted "yes" on that question, as had eight other jurors. The court resumed polling by show of hands for the third verdict form, which addressed the reasonable accommodation claim. When counsel for AHS stated he found it difficult to follow the show of hands and requested individual polling, the court instructed the clerk to re-start the polling on the third verdict form with individual voice votes.

During the polling on the fourth question on the third form, Juror No. 5 initially stated that he was not required to answer the question (which asked whether AHS failed to provide reasonable accommodation) because he had answered "no" to the previous question (which asked whether Steiger was able to perform the essential duties of the job with reasonable accommodation). The court addressed the presiding juror, stating that because nine people had answered "yes" to question three, as reflected in the individual polling that had just occurred, "everyone should have answered Question 4." The presiding juror confirmed that all jurors had discussed and voted on voted on the third and fourth questions, and had "reached a consensus." The court then asked Juror No. 5 whether he had answered question four, and the juror responded, "I did have a consensus with these answers. But I listed them differently. I'm sorry."

At that point, the court held a side bar at the request of AHS. The transcript of the side bar reflects that AHS asked the court to send the jury back to answer the questions on the verdict forms again. In its opening brief on appeal, AHS reports that fact and states that "the trial court decided to continue by only making a further record to which it was satisfied." That is the end of AHS's account of the jury polling.

AHS neglects to mention that during the side bar, it requested that as an alternative to sending the jury back for further deliberations the court

29

should re-poll the jurors, asking each to state how they voted on each question, so as to create a clear record. And AHS tells us nothing about the "further record" that was made or what happened after the side bar.

What happened was this: the court started the polling again, beginning with the first verdict form. The clerk proceeded question by question through each of the forms, eliciting an answer from each juror as to their vote, just as AHS had requested. The individual polling confirmed that the jurors' votes were consistent with the completed verdict forms: at least nine jurors agreed with each of the answers that was recorded on each of the six forms.

At the conclusion of the individual polling, in response to concern expressed by AHS that Juror No. 5 had not understood the jury instructions and therefore had not answered question four on the third verdict form, the trial court interviewed Juror No. 5 in the presence of counsel but outside the presence of the rest of the jury. Juror No. 5 stated affirmatively that he had voted on the question and stated what his vote had been. The court was satisfied that Juror No. 5 deliberated and voted on the required question.

3. *AHS's Claims of Error*

AHS points to nothing in the record to support its assertion that the trial court improperly rushed through the polling process. Any claim of error in this regard has been forfeited by AHS's failure to provide supporting record citations or legal authority on the issue. (*Allen, supra*, 234 Cal.App.4th at p. 52; *Duarte, supra*, 72 Cal.App.4th at p. 856.) In any event, the record shows that, far from rushing, the court took pains to ensure that each juror stated his or her vote on each question on each verdict form—going so far as to re-poll the jurors individually as to each question on the first

30

verdict form, even though no questions had arisen during the initial polling by show of hands.

AHS also asserts that "at least one, and as many as three or four jurors" did not answer all the required questions on the verdict forms and that during polling "they were forced to decide on the fly, when prompted by the court clerk." These assertions are not supported by the record. Only one juror—Juror No. 5—ever suggested that he had not answered all the required questions. AHS fails to report that Juror No. 5 was questioned about that issue on two separate occasions by the trial court, and both times confirmed that he had answered the question at issue. And although AHS contends that Juror No. 10 "changed their vote" on question four on the second verdict form, the record shows that there was no change in vote: Juror No. 10 initially failed to raise their hand (indicating a "no" vote), but then apologized for that and reported their "yes" vote in the individual poll that immediately followed.

Finally, Juror No. 10's initial failure to raise their hand underlies AHS's claim that the jury's verdict on the cause of action for disparate treatment was not supported by a three-fourths vote. To support this claim AHS relies on the clerk's initial tally of the show of hands for question five on the second verdict form, disregarding the portion of the record showing that when the clerk sought to confirm the initial tally of four "no" votes, Juror No. 10 apologized for keeping their hand down and reported that their vote was "yes." In short, AHS fails to show that any of the verdicts lacked a three-fourths vote.

## DISPOSITION

The judgment is affirmed. Respondent shall recover her costs on appeal.

31

_____
Miller, J.

WE CONCUR:


_____
Richman, Acting P. J.


_____
Desautels, J.


A168216, A168382, *Steiger v. Alameda Health System*

32