Filed 1/6/26  In re N.D. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| In re N.D. a Person Coming Under the Juvenile Court Law. | |
| SHASTA COUNTY HEALTH AND HUMAN SERVICES AGENCY, | C102810 |
| Plaintiff and Respondent, | (Super. Ct. No. 22JV3227201) |
| v. | |
| H.D. et al., | |
| Defendants; | |
| S.M. et al., | |
| Interveners and Appellants. | |

Appellants J.M. and S.M. are the maternal great-uncle and great-aunt of minor N.D.  They appeal from the juvenile court's orders denying their petition for modification seeking the removal of N.D. from her current caregivers' home for placement in their home.  (Welf. & Inst. Code, §§ 388, 395.)[1]  We affirm.

---

[1]      Further undesignated statutory references are to the Welfare and Institutions Code.

1

BACKGROUND

This matter commenced in April 2022 when the Shasta County Health and Human Services Agency (Agency) filed a section 300 petition on behalf of the then one-year-old minor N.D. and her four siblings. N.D. and two of her brothers were placed in the home of N.D.'s current nonrelative caregivers. After less than a month, the caregivers requested N.D. remain in the home but her two brothers be removed. At the time of the June 2022 disposition hearing, the two brothers had been removed and N.D. and her siblings were separated into three different foster placements.

In November 2022, appellants attended a family program where they visited with N.D. and her siblings. It was at this time that appellants learned that the parents were not on track to reunify. S.M. began calling the social worker to express her interest in becoming the children's permanent placement. S.M. stated she was able to finally reach the social worker in March 2023, after four months of attempts, but was told that the children were on track to reunify with the father

The Agency had planned to move N.D. and place her with her two brothers, but that move did not occur and N.D. remained in her original placement. The parents failed to reunify and N.D.'s caregivers were given de facto parent status and, on September 15, 2023, designated N.D.'s prospective adoptive parents. The order designating N.D.'s caregivers as prospective adoptive parents was vacated on December 6, 2023, as premature but reinstated on January 5, 2024, when parental rights were terminated and adoption determined to be N.D.'s permanent plan.

On March 7, 2024, the Agency filed a notice of intent to remove child. The Agency requested a court order to remove N.D. from her current caregivers, the prospective adoptive parents, and place her with her two brothers' relative care providers, the appellants. N.D.'s caregivers filed a formal objection to removal of the minor from their home. Appellants filed a section 388 petition for modification seeking placement of

2

N.D. in their home with the minor's two brothers or, alternatively, a visitation order. Thereafter, appellants filed a request for de facto parent status.

On May 22, 2024, N.D.'s caregivers filed a report authored by Dr. J. Reid McKellar regarding his bonding study of N.D. The report provided the following summary and conclusions:

"[N.D.] is a three-year-old toddler who has a vital and essential bond with [her current caregivers]. [N.D.]'s bond with and attachment to the [caregivers] is like that of a biological child with healthy, attentive, and nurturing biological parents.

"For numerous reasons, severance of the bond between [N.D.] would be developmentally, neurologically, and socio-emotionally detrimental to [N.D.]

"[N.D.] came into care exhibiting developmental delays, and she responded positively to both developmental intervention and the stable and loving care she has received from [her caregivers]. However, [N.D.] is still developmentally fragile, and she is at exceedingly high risk of developmental derailment. This is due to [N.D.]'s early childhood trauma, [N.D.]'s inborn temperament and anxious predisposition, and the destabilizing effect that [N.D.]'s shifts in case plan have had on her in the recent past.

"[N.D.] continues to be [at] a critical period of brain development, and she is still at a critical stage of attachment, particularly when one considers that [N.D.] came into care with clear signs of psychological trauma and developmental delay. The loss of [N.D.]'s bonds with the [current caregivers] would be devastating, particularly since [N.D.]'s bonds with her siblings is, at best, fair in quality, and at worst, destabilizing.

"Finally, [N.D.] has not just formed an enriching and vital bond with [her caregivers], she has a strong sibling bond with her foster siblings. The quality of the bonds was clearly evident during the noted observations conducted by this writer, and the shift in [N.D.]'s presentation from the biological sibling observation to the home setting observation was both instructive and compelling."

Dr. McKellar concluded that "[o]bservational data, collateral data, and evaluation data indicate that it is in [N.D.]'s best interest to remain in her prospective adoptive home and complete the adoption process with [her current caregivers]. Severance of the bond between [N.D.] and [the caregivers] would have a detrimental impact on [N.D.]."

The Agency filed an interim report prior to the contested hearing on the objection to the intent to remove and petition for modification. The Agency believed the most suitable permanent placement for N.D. was with appellants, where she could maintain a sibling relationship with her two brothers, along with maintaining a connection to her maternal extended family and possibly her paternal family. The Agency represented that appellants were prepared to raise all five siblings and recommended the juvenile court order the removal of N.D. from the prospective adoptive parents/current caregivers, so she could be placed with appellants.

The hearing took several days over the course of several months, with testimony from appellant S.M., two social workers, the adoptions worker, and Dr. McKellar. At the conclusion of the hearing, the juvenile court took the matter under submission. Shortly thereafter, the Agency filed a report stating that N.D.'s caregivers considered N.D. (now three and a half years of age) a member of the family and wanted to adopt her. N.D. was secure in their care, sought them out for comfort and affection, developed a close relationship with them, and viewed them as her parents.

On October 22, 2024, the juvenile court filed a form order after hearing, denying appellant's request for placement of N.D., but granting their request for visitation. The court also denied appellant's request for de facto parent status. On November 4, 2024, the court filed its order after hearing, adopting the earlier written ruling as its final order.

DISCUSSION

Appellants contend the juvenile court erred in denying the request to remove N.D. from her current caregivers' home and place her in their home.**2** Appellants emphasize that they sought placement of N.D. and her siblings in their home in Arizona promptly after learning the parents were not on track to reunify and later moved to California to increase the likelihood the children would be placed with them. They represent that they have since adopted N.D.'s two oldest siblings. They argue the juvenile court did not consider the importance of sibling and family relationships.

While appellants also raise general allegations of denial of due process which allegedly took place earlier in the proceedings, specifically identifying delays in filing their interstate compact on the placement of children (ICPC) paperwork, the failure to be notified of "important" court hearings, and the denial of a continuance to allow them to obtain their own bonding study, only the juvenile court's ruling on the petition for modification is before us in this appeal.**3** We therefore limit our discussion to our review of the section 388 orders from which this appeal was taken.

---

**2** Appellants also request N.D.'s remaining siblings be placed in their home, as well. But, as the siblings are not subjects of the instant appeal, we do not address this request.

**3** We note, however, the juvenile court did not deny appellants' request for a bonding study, made at the confirmation hearing a week before the contested hearing date. The court expressly stated that it had "no problem allowing [appellant's counsel] the opportunity to have the children present for a bonding assessment" and even requested the Agency arrange to allow appellants' expert to observe a visit between the siblings, but the court would not continue the hearing. The hearing began the following week, but spanned eight hearing dates over two months, allowing sufficient time to secure or revisit additional expert evidence.

In addition, appellants also make claims that they were denied the opportunity to refute evidence presented on a flash drive and undue influence and/or bias on the part of the attorneys and/or court. These claims are not substantiated by citation to the record so we do not discuss them further. (Cal. Rules of Court, rule 8.204(a)(1)(C); *In re S.C.* (2006) 138 Cal.App.4th 396, 408 [to demonstrate error, appellant must present  legal

5

As a preliminary matter, the Agency argues that appellants were required to bring this challenge to the juvenile court's order by extraordinary writ petition pursuant to section 366.28 because it is a challenge to a posttermination of parental rights order that a dependent child is to reside in, be retained in, or be removed from a specific placement. Such orders are not, it argues, appealable at any time unless (1) a petition for extraordinary writ was timely filed; (2) the petition substantively addressed the specific issues to be challenged and supported that challenge by an adequate record; and (3) the petition was summarily denied or otherwise not decided on the merits. (§ 366.28, subd. (b)(1).) Appellants did not file such a petition here.

The Agency, however, does not address nor distinguish *In re Shirley K.* (2006) 140 Cal.App.4th 65, 70-71 or *In re Daniel C.* (2006) 141 Cal.App.4th 1438, 1443-1445, which concluded, in similar procedural postures, that a section 388 petition order denying a request to move a minor to a different placement is appealable, despite the provisions of section 366.28, subdivision (b)(1). But even assuming appellants were not required to bring their challenge to the juvenile court's order by extraordinary writ petition pursuant to section 366.28, their contention still fails.

The juvenile court has the authority and responsibility to determine whether removal from the home of a prospective adoptive parent is in the child's best interests. (§ 366.26, subd. (n)(3)(B).)[4] When the Agency requests the removal, it must prove by a

---

analysis supported by citations to authority and citations to facts in the record that support the claim of error]; *Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856 [appellate court may disregard unsupported arguments].)

[4]      Appellants argue, in their reply brief without analysis or legal authority, that the designation of N.D.'s caregivers as her prospective adoptive parents was "unlawful." We need not address this argument. (*In re S.C.*, *supra*, 138 Cal.App.4th at p. 408 [to demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error]; *Duarte v. Chino Community Hospital*, *supra*, 72 Cal.App.4th at p. 856 [appellate court may disregard unsupported arguments]; *Grassi v. Superior Court* (2021) 73 Cal.App.5th

preponderance of the evidence that removal from the prospective adoptive parent is in the child's best interests. (*T.W. v. Superior Court* (2012) 203 Cal.App.4th 30, 45.) Likewise, appellants here, as the parties petitioning for modification of a court order pursuant to section 388, have the burden of proof by a preponderance of the evidence of both changed circumstances or new evidence and that the requested order would serve the minor's best interests. (*In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703.) A modification "petition is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415.)

We conclude the juvenile court did not abuse its discretion in denying the petition for modification seeking removal of N.D. from the prospective adoptive parents/caregivers' home for placement with appellants.

In its written ruling, the juvenile court stated it had considered all the evidence, but it found the testimony of Dr. McKellar to be the pivotal evidence. Dr. McKellar concluded that removal of N.D. from her current home would have a detrimental impact on the child. As noted by the court, Dr. McKellar never wavered from his opinion that removal at this time in N.D.'s life and stage of development would be detrimental to her emotional and physical wellbeing.

---

283, 303, fn. 10 ["We do not generally consider arguments raised for the first time in a reply"].)

In any event, the initial designation was withdrawn as premature, since it was made prior to termination of parental rights. The court's later order designating the caregivers as the prospective adoptive parents was entered after termination of parental rights. Under section 366.26, subdivision (n), the juvenile court "may designate a current caretaker as a prospective adoptive parent if the child has lived with the caretaker for at least six months, the caretaker currently expresses a commitment to adopt the child, and the caretaker has taken at least one step to facilitate the adoption process." (§ 366.26, subd. (n)(1).) Appellants have not demonstrated any error in the court's operative order.

7

Dr. McKellar testified he performed a bonding assessment of N.D. in her current placement, including review of her Far Northern Regional Center records, and observation of N.D. in his office, during a visit with her siblings, and in the home of her current placement. Based on his observations of N.D. with her caregivers in his office setting, he described N.D. as a "temperature taker," who is initially inhibited and slow to warm up. She is not, by nature, bold, hyperactive, or outgoing. He explained that, considering her age and temperament, N.D. was at developmental risk should she undergo a change in care providers, which could result in "anything from a developmental derailment to a developmental regression." He determined N.D. was spontaneously affectionate and strongly bonded with her current caregivers and found her foster father to be "remarkably adept at connecting to [N.D.] at a developmentally appropriate level." N.D. looked to her caregivers for cues and drew a sense of safety from them, demonstrating her trust and strong bond.

In contrast, Dr. McKellar observed N.D. to be anxious during her visits with her siblings. She spent most of the visit sitting next to an adult observer to whom she directed most of her overtures and from whom she took most of her cues. While she joined in play on two or three occasions, she did a lot of watching and holding back. At the end of the visit, N.D. clearly wanted to leave with the observer and did not walk out with the siblings who, unlike N.D., greeted S.M. enthusiastically. Instead, N.D. hung back and, as soon as her foster mother appeared, N.D. ran to her without looking back or saying goodbye.

When Dr. McKellar later observed N.D. in her home, he noted N.D. was very relaxed, chatty and "free." She immediately waved to him – a gesture that demonstrated a healthy response of "warm[ing] up" to a new adult which, in turn, demonstrated her secure bond with her caregivers. N.D. also seemed very comfortable, playful and sweet toward the young boy in the home. Dr. McKellar was very encouraged to see N.D., who

had early developmental delays, to have benefitted from a strong, healthy placement from her "perceived parents."

Dr. McKellar observed that N.D. had been in her caregiver's home for a long time, had formed a "remarkably strong bond" with them, and was separately also at high risk for detrimental impact should there be severance of that bond. Dr. McKellar defined detriment, not as "distress" or "discomfort, but as "harm that is so serious that it is almost certain to cause irreparable damage." Dr. McKellar explained it was crucial in determining detriment to consider, not only what one observed, but the age of the child, the child's development and attachment, when the critical periods of bonding and attachment occur and when the critical periods of development occur. Considering N.D.'s critical age of development and developmental risk, her critical age of brain development, and her having already experienced a significant loss, Dr. McKellar opined that moving her would expose her to "triple damage" and that she could be moved to a home with siblings did not overcome this damage.

Dr. McKellar explained that children at the age of three, such as N.D., do not have an adult concept of siblings. They "have a concept of who is safe, who is unsafe, and who is the person upon which I rely more than anyone in the [world]." N.D. does not see it as "I want to be with bio family versus this family," she just sees it as: "Who is family? Who does she trust? Who is she safe with?" From N.D.'s perspective, the children she lives with are her siblings. And she looks to her current caregivers to form connections with others. She had been in her current placement for two years. Her primary bond is with her current caregivers. It would be erroneous and not supported by any research to assume she would form this attachment in another placement. Should she be moved, Dr. McKellar would "absolutely expect" developmental derailment "at the very least" and would also expect, based on "empirically validated" research, a much higher risk factor for depression and anxiety – "without a doubt."

While we recognize appellants' disappointment that N.D. was not moved to their home earlier in these proceedings and that appellants are willing to care for all siblings in this case, the evidence supports the juvenile court's determination that moving N.D. in response to the section 388 petition was not in her best interests. We conclude the juvenile court did not abuse its discretion in denying the petition for modification seeking a placement change for the minor.[5]

## DISPOSITION

The orders of the juvenile court are affirmed.


/s/_____
WISEMAN, J.[*]


We concur:


/s/_____
KRAUSE, Acting P. J.


/s/_____
MESIWALA, J.

_____

[5] We observe the trial court was faced with a very difficult decision when determining placement of N.D. This dilemma was well expressed by N.D.'s counsel who stated, "I think how this has played out and why we're here today, there is not a good choice. Any way the court goes is going to be devastating to one party. But, I don't think I can ignore the testimony of Dr. McKellar. Certainly in an ideal world all of these siblings could be raised together, but, unfortunately, how we got here . . . I don't know that it is possible."

[*] Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.